## PROTECTIVE COMMITTEE FOR INDEPENDENT STOCKHOLDERS OF TMT TRAILER FERRY, INC. *v.* ANDERSON, TRUSTEE IN BANKRUPTCY, ET AL.

No. 38. Argued November 7–8, 1967.—Decided March 25, 1968.

416

*Irwin L. Langbein* argued the cause for petitioner. With him on the briefs was *Irma S. Mason.*

*William P. Simmons, Jr.,* argued the cause and filed a brief for respondent Anderson. *M. James Spitzer*

argued the cause for respondents Shaffer et al. With him on the brief were *Ronald J. Offenkrantz* and *Jackson L. Peters.*

*David Ferber,* by special leave of Court, argued the cause for respondent Securities and Exchange Commission. With him on the briefs were *Solicitor General Griswold, Ralph S. Spritzer, Daniel M. Friedman, Philip A. Loomis, Jr.,* and *Paul Gonson.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case involves a corporate reorganization under Chapter X of the Bankruptcy Act, 52 Stat. 883, 11 U. S. C. §§ 501–676. In the most recent proceedings [1] the District Court approved an amended plan of reorganization and discharged the petitioner Committee.[2] The Court of Appeals for the Fifth Circuit affirmed, 364 F. 2d 936 (1966). We granted certiorari, 387 U. S. 929 (1967), because this case presents important questions under the bankruptcy laws. Since we believe the Court of Appeals erred in affirming the decision of the District Court, we reverse the judgment and remand for further proceedings consistent with the views expressed below.

---

[1] This case has been in the federal courts for over 10 years. The earlier reported decisions consist of the following: *Caplan v. Anderson,* 256 F. 2d 416 (C. A. 5th Cir. 1958); *Caplan v. Anderson,* 259 F. 2d 283 (C. A. 5th Cir. 1958); *TMT Trailer Ferry, Inc. v. Anderson,* 292 F. 2d 455 (C. A. 5th Cir. 1961), cert. denied *sub nom. Shaffer v. Anderson,* 368 U. S. 956 (1962); *United States v. Anderson,* 334 F. 2d 111 (C. A. 5th Cir.), cert. denied, 379 U. S. 879 (1964); *In re TMT Trailer Ferry, Inc.,* 334 F. 2d 118 (C. A. 5th Cir. 1964).

[2] The order of the District Court discharging the petitioner Committee was later modified to permit the Committee to prosecute appeals from that decision.

## I.

The debtor, TMT Trailer Ferry, Inc., was incorporated in 1954. Its principal business is transporting freight between Florida and Puerto Rico. It pioneered "fishyback" transport, the ocean-going equivalent of "piggyback" transport. Freight loaded into highway trailers is rolled on and off sea-going barges without rehandling. In its original operations TMT used rented tugs to tow converted Navy LST's loaded with such trailers and other freight. Later it undertook to convert a self-propelled Navy LSD for use in its business. Substantial debts and losses arose from the unsuccessful conversion and consequent failure in service of this ship, dubbed the *Carib Queen*.

In addition, between 1954 and 1957, more than 4,000,000 shares of TMT common stock were issued, many of them acquired at low prices by persons close to the company and disposed of to the public at relatively high prices. As a result of these transactions and others, TMT became unable to meet its obligations, and a reorganization proceeding was initiated against it by involuntary petition in June 1957. The debtor consented to reorganization, and C. Gordon Anderson was appointed trustee. The motion of the holders of preferred ship mortgages on the debtor's vessels (the Caplan mortgage) to foreclose their liens was denied by the trial court. On appeal from this order, it was pointed out that no plan of reorganization had yet been proposed, that the possibility of successful reorganization had not been explored, and that no evidence had been received to support any of the court's orders. The Court of Appeals reversed and remanded with instructions that the holders of the Caplan mortgage be permitted to foreclose unless adequate provision was made to protect their interests or unless they would not be prejudiced by further delay.

Upon remand the trial court held appropriate hearings. It was determined that the debtor was being operated in a manner which would produce substantial profits. A plan of reorganization was proposed which would have given the Caplan mortgage group all the common stock in the reorganized company, a substantial portion of the preferred stock, and control of the board of directors. In February 1959, without a hearing called for that purpose and solely on the basis of documents and records, the trial court declared the debtor insolvent and held that the original stockholders had no further interest in the reorganized corporation. In March 1959 the plan of reorganization was confirmed, and Anderson resigned as trustee to become president of the reorganized company. A new trustee was appointed, and he sought in effect to vacate the order confirming the plan. His petition alleged that the holders of the Caplan mortgage and Merrill-Stevens Dry Dock & Repair Co. (M–S), another substantial creditor, had entered into an undisclosed agreement in violation of § 221 of Chapter X, 52 Stat. 897, 11 U. S. C. § 621, an agreement according to which the Caplan mortgage group would pay M–S in order to procure its consent to the plan of reorganization. This petition was denied, the successor trustee was removed, and Anderson was reinstated as trustee.

The petitioner Committee appealed from the order confirming the reorganization plan. Objection was made to the failure of the trial court to order an investigation into the claims of certain creditors and to the failure to conduct a hearing on insolvency. While that appeal was pending, the Caplan group, supported by Anderson, petitioned the trial court to consummate the confirmed plan. The Securities and Exchange Commission, however, filed a petition in the trial court seeking an investigation.[3] It

---

[3] The SEC participated as a party in both the District Court and the Court of Appeals, and has appeared as an unnamed respondent before this Court. See 52 Stat. 890, 894, 11 U. S. C. §§ 572,

alleged that an investigation would disclose that the plan was unfair because it turned the corporation over to persons who had dealt extensively in the stock of the debtor in transactions which were probably illegal. It was agreed among the parties that an investigation should be made.

Anderson, in his re-established role as trustee, conducted the investigation. Fourteen days of hearings were held, 2,200 pages of testimony transcribed, and some 60 exhibits collected. Anderson's report from this investigation covers 40 pages in the original record. He concluded that the debtor's business had been "wrecked by gross mismanagement, by unwise and unsound expansion financed primarily through the sale of securities in disregard of the protective provisions of the Securities Act of 1933," and that the debtor had substantial causes of action against holders of the Caplan mortgage. Upon the recommendation of Anderson, the trial court vacated its order confirming the 1959 plan, and the Court of Appeals affirmed.[4]

Early in 1962 two new plans of reorganization were proposed. The "internal plan," recommended by Anderson, provided for reorganizing the debtor by issuing new common stock to creditors and involved "compromises" of the Caplan mortgage and M–S claims. The "cash plan" entailed similar "compromises" as well as selling the debtor's assets for cash to persons unconnected with the company and distributing the cash

608. This Court requested the Government to express its views at the petition stage, 386 U. S. 901 (1967). For the most part the SEC has taken positions consistent with those of the petitioner Committee.

[4] *TMT Trailer Ferry, Inc.* v. *Anderson,* 292 F. 2d 455 (C. A. 5th Cir. 1961), cert. denied *sub nom. Shaffer* v. *Anderson,* 368 U. S. 956 (1962). The Committee's earlier appeal attacking the confirmation of the 1959 plan, which had been consolidated with this appeal by the Caplan mortgage group, was mooted by the order of the trial court vacating the confirmation.

to creditors. Neither plan provided for any participation by stockholders. The Committee, supported by the SEC, objected to the exclusion of stockholders from both plans, and opposed the internal plan because it contemplated that Anderson would become president of the reorganized company. After hearings on valuation, the District Court found the debtor insolvent and approved both plans as fair, equitable, and feasible. A majority of all classes of creditors other than the United States accepted the internal plan, and the District Court confirmed it in February 1963. The Committee appealed, supported by the SEC, arguing that the plan wrongly excluded stockholders and improperly contemplated that Anderson would become president. The Court of Appeals ruled, without reaching the other contentions, that it was permissible for the plan to contemplate that Anderson would become president,[5] but it held in a separate appeal that the plan was defective for not giving priority to the Government's nontax claims.[6] The case was accordingly remanded to the District Court for determination of whether the plan would be feasible if the Government's claims were given full priority.

On remand further hearings were held, the District Court found that if the Government's nontax claims were given priority the plan would be feasible, and amendments were authorized which provided for immediate cash payment to the Government. The court regarded the failure of the Court of Appeals to reverse its other orders as in effect an affirmance of them, and it refused to consider again the contentions of the Committee and the SEC. The creditors accepted the amended plan and, over the objections of the Committee and the SEC that the plan was not fair or equitable, the District

---

[5] *In re TMT Trailer Ferry, Inc.,* 334 F. 2d 118 (C. A. 5th Cir. 1964).

[6] *United States* v. *Anderson,* 334 F. 2d 111 (C. A. 5th Cir.), cert. denied, 379 U. S. 879 (1964).

Court affirmed it. The Committee again appealed, and the Court of Appeals ruled that its earlier decision had left open all issues not in terms discussed and decided.[7] Passing over the fact that the District Court had considered the case in erroneous legal perspective, and emphasizing that its obligation was to determine whether the trial judge had "abused his discretion" or reached conclusions which were "clearly erroneous," the Court of Appeals refused to remand the case. Stating that "[t]his . . . litigation must at long last be brought to an end," the Court of Appeals affirmed all judgments and orders of the District Court. The Committee, again supported by the SEC, has presented a number of questions on certiorari to this Court.[8] Because of the view we take of this case, it is necessary to consider only the questions of whether it was error to affirm the District Court's approval of compromises of substantial claims against the debtor, and whether it was error to affirm the District Court's judgment that the debtor was insolvent, when that judgment was rendered without considering the future estimated earnings of the reorganized company.

---

[7] *Protective Committee* v. *Anderson*, 364 F. 2d 936, 939 (C. A. 5th Cir. 1966).

[8] The other issues, briefed and argued at length, are succinctly stated in the brief filed by the SEC:

"1. Whether under Chapter X of the Bankruptcy Act, which provides for a disinterested trustee as the focal point of the reorganization, the trustee is precluded from assuming the presidency of the reorganized company; and whether a plan that contemplates that result may be confirmed.

.        .        .        .        .

"4. Whether the courts below erred in refusing to consider the merits of the stockholders' claims based on asserted violations of the securities laws.

"5. Whether the district court erred in discharging the Stockholders' Committee before the reorganization proceedings were completed, on the basis of its finding that the debtor was insolvent." Brief for SEC 2, 3.

## II.

Compromises are "a normal part of the process of reorganization." *Case* v. *Los Angeles Lumber Prods. Co.,* 308 U. S. 106, 130 (1939). In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the "informed, independent judgment" of the bankruptcy court. *National Surety Co.* v. *Coriell,* 289 U. S. 426, 436 (1933). The requirements of §§ 174 and 221 (2) of Chapter X, 52 Stat. 891, 897, 11 U. S. C. §§ 574, 621 (2), that plans of reorganization be both "fair and equitable," apply to compromises just as to other aspects of reorganizations. *Ashbach* v. *Kirtley,* 289 F. 2d 159 (C. A. 8th Cir. 1961); *Conway* v. *Silesian-American Corp.,* 186 F. 2d 201 (C. A. 2d Cir. 1950). The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co.,* 196 F. 2d 484 (C. A. 7th Cir. 1952). There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every

instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. It is here that we must start in the present case.

The Caplan mortgage, consisting of preferred ship mortgages on the debtor's vessels, bears a face amount of $330,000. The holders paid $280,500 for it. Under the proposed compromise, the holders would receive $280,500 paid in five annual cash installments, plus interest from the original due date.[9] The claims filed against the debtor's estate by M–S totaled $1,628,284, of which $574,580 was said to be secured by maritime liens on the debtor's vessels. Under the terms of the compromise, these claims are to be allowed in full, after reducing them all to the status of unsecured claims. As with other unsecured claims, they would be paid for by issuing common stock in the reorganized company. M–S would wind up holding approximately 40% of the stock in the new company.[10] A glance at these terms makes it clear that the compromises involve substantial recognition of the claims filed by the Caplan group and M–S against the debtor. Whether compromising on these terms was fair and equitable to the debtor, the other creditors, and the stockholders depends upon the proper assessment of the claims which the debtor allegedly had against both the Caplan group and M–S.

The Caplan mortgage was the focal point of the 1960 investigation conducted by the trustee, Anderson. The

_____

[9] The interest is to be treated as an unsecured claim payable in common stock in the reorganized company. The plan confirmed by the court was later amended to provide that the holders of the Caplan mortgage would receive $250,000 in cash at the date of consummation of the reorganization plan, rather than $280,500 over five years.

[10] Since the rest of the voting stock will go to the other numerous and scattered general creditors, petitioner argues that M–S' 40% ownership will give it initial working control of the reorganized company. Petitioner's Brief 28, 29.

mortgage was entered into shortly before the petition in bankruptcy was filed. It was needed to raise cash to meet payments due on the *Carib Queen*. After an extensive investigation, Anderson concluded that the mortgage was a fraudulent transfer not given for fair consideration. Anderson's report succinctly stated the unfairness of the terms of the mortgage:

> "The Caplan Group paid $280,500 cash for the mortgage to TMT which paid all of the expenses of the transaction. The mortgage was for $330,000 payable in seven months and is convertible into common stock at the option of the holders, one share of common for each $1.25 of principal amount of the mortgage. This gave the Caplan Group an effective interest rate of 30% per annum prior to maturity and an opportunity to straddle because of the conversion feature. If TMT prospered, they could convert the mortgage into common stock for which they would have paid little more than $1.00 per share; if TMT did not, the Caplan Mortgage was in a senior position and constituted a lien on TMT's prime assets, absolutely necessary to the Company's operation. Since the Carib Queen had broken down, the vessels encumbered by the mortgage were the main producers of income for the company."

Anderson found that there was "ample evidence" to support this view of the mortgage, and that therefore the mortgage should be treated as null and void. So treating it would not release TMT from the obligation to repay the money received, but in claiming that amount the holders of the mortgage would have no higher status than general unsecured creditors.[11]

---

[11] Accordingly, to pay holders of the Caplan mortgage $280,500 in cash, even though only the amount they paid for the mortgage,

In addition, Anderson's report concluded that the principal holders of the Caplan mortgage, Abrams, Shaffer, and Erdman, had diverted corporate opportunities through the flagrant abuse of their control, fiduciary or inside positions, and should be made to account for the profits they had made. Nearly half of the roughly 4,000,000 shares of outstanding TMT common stock reached the public via purported private offerings through Abrams and Shaffer. These two men exercised a high degree of control over the affairs of the company, and Erdman went along with them and participated in many of their transactions. Anderson found that these three occupied a fiduciary relationship with TMT, at least insofar as issuance of capital stock to them was concerned. "They took advantage of their inside position to obtain stock for less than the market price which they sold to the public without any registration under the Securities Act and in apparent violation of the private offering exemption under which all of the stock was issued." The activities of these three men substantially lessened TMT's chances of obtaining financing from reputable financial institutions "and by the time the Caplan mortgage was executed they were in a position to dictate terms which TMT would be forced to accept." Anderson's report continued:

> "It is the opinion of the trustee that persons such as Abrams, Shaffer and Erdman who come in as creditors of TMT under the Caplan Mortgage . . . should be barred in this equity proceeding from profiting at TMT's expense. Their claims should be reduced by the profits they have made on sales of TMT stock which they acquired for private in-

would be a substantial preferment of them when the reorganization plan allows general unsecured creditors only a pro rata portion of some 1,300,000 shares of new common stock in the reorganized company.

vestment purposes, but which they sold in violation of the law at great profit to themselves. These profits are either admitted or readily ascertainable and should be returned to the company."

Characterizing the conduct of Abrams, Shaffer, and Erdman in acquiring unregistered TMT stock with no intention of holding it for investment as a "fraud," Anderson indicated the possibility of liability under the SEC's Rule 10b–5.[12] Anderson said that at a minimum their claims should be subordinated to those of innocent creditors.[13]

As a result of the report filed by trustee Anderson, the order confirming the 1959 plan of reorganization was vacated. Both the trustee and the SEC filed objections to the Caplan mortgage claim, grounded on the reasons presented in the report of the investigation. The District Court never held hearings on these objections. The mortgage was not set aside as a fraudulent transfer, nor was it decided to use the claims against Abrams, Shaffer, and Erdman as setoffs or as a means of subordinating the mortgage claims. Rather, the internal plan of reorganization was approved by the District Court, providing for a "compromise" of the Caplan mortgage along the lines already indicated. The holders of the mortgage were to receive in cash what they had put up for the mortgage, plus interest on the principal from the original due date.[14]

Separate from the Caplan mortgage claims were the claims filed by M–S, the company in charge of convert-

---

[12] 17 CFR § 240.10b–5; promulgated by the SEC pursuant to § 10 (b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j.

[13] Such subordination would effectively eliminate their claims if TMT were as insolvent as the court subsequently found.

[14] These terms were later modified, as indicated in n. 9, *supra*.

ing the Navy LSD into the self-propelled trailership which TMT christened the *Carib Queen*. These claims totaled $1,628,284, of which over $1,000,000 was for the unpaid balance due for converting the *Carib Queen*. Maritime liens on other vessels owned by TMT allegedly secured $574,580 worth of these claims. The United States, in its position as a substantial creditor of TMT, filed objections to M–S claims, stating that none of them were entitled to status as secured claims "for the reason that they arose more than one year prior to the commencement of the reorganization proceedings herein." It also contended that the claims had no status as secured lien claims, for "it is a recognized principle of Admiralty and Maritime law that claims for the construction or reconstruction of vessels do not give rise to Maritime liens." Whether the portion of the claims for which M–S asserts secured status is actually entitled to that status has never been determined. The "compromise" of the M–S claims amounted to allowing them in their entirety as unsecured claims.

On the maiden voyage of the *Carib Queen* a series of boiler failures caused the vessel to break down and necessitated extensive repairs. In November 1958 the petitioner Committee notified the District Court that in its opinion the "series of catastrophes" which had befallen the *Carib Queen* was due to "faulty design, inadequate inspection, defective work on the remodeling and later repair of the ship, hasty and improper preparations for a hazardous sea voyage and utilization of the ship in a service for which she was not fitted and in an unseaworthy condition." The Committee thought that TMT had causes of action which could lead to the recovery of substantial sums of money. Although Anderson's report on his subsequent investigation of the affairs of TMT dealt with causes of action other than those associated

with the Caplan mortgage, it made no mention of any claims TMT might have against M–S. The SEC objected to the M–S claims, stating that there were grounds for disallowing them and that the matter should be referred to a special master for investigation. Trustee Anderson also sought reference of these claims to a special master. On September 1, 1961, the SEC filed detailed specifications of its objections to the M–S claims, based on its own investigation into them. The SEC stated that the debtor

> "has meritorious defenses and an offset or counter-claim because M–S (a) did not properly convert the vessel; (b) did not comply with the terms of the contract; (c) did not properly repair the vessel; and (d) performed certain work for and furnished certain materials to TMT, with no agreement as to price; M–S has failed to establish the value of such work and materials."

The SEC described with some particularity the facts which had led it to this conclusion. The most important of these related to the boiler failure which occurred shortly after M–S delivered the *Carib Queen* for its maiden voyage. Within 48 hours of sailing from Jacksonville, Florida, bound for San Juan, Puerto Rico, it was discovered that a boiler and several tubes were leaking. Tubes overheated, ruptured, and were distorted as a result of scale which had formed on their inner surfaces. The SEC attributed the scale to M–S' negligence in running the boilers with raw water. The SEC also stated that the improper priming of the boilers that occurred on the first trip was due to installation of incorrect baffles by M–S. M–S had undertaken to make the required repairs, and the SEC stated that this repair work was performed negligently, leading to further tube fail-

ures. Part of the M–S claims was for unpaid charges for this repair work. M–S filed an answer on September 1 which admitted that when the *Carib Queen* was delivered it was suffering from "certain construction deficiencies," but denied any liability. It contended that its asserted lien claims were secured and that it had performed the repair work in a proper manner.

Although the SEC and the trustee had sought reference of the M–S claims to a special master for a hearing, no such hearing was ever held. Instead, the trustee subsequently moved for the summary allowance of the claims on the ground that there was only a "remote" possibility of materially reducing them by litigating the objections filed against them, and that such litigation would cause "unnecessary delay." [15] At the hearing during which the trustee presented his motion for allowing the M–S claims in full, no further explanation of this recommendation was provided. Counsel for the Committee protested that "this is not a report, this is a bare statement of conclusion." The trial judge himself recognized the importance of the question. He said:

> "I am concerned myself. I do know that whoever turned that vessel [the *Carib Queen*] loose with the

---

[15] The trustee reached this conclusion after an investigation described by him in full as follows: "[T]he trustee, with the assistance of attorneys in the office of his counsel, investigated the facts alleged in the specifications of objections filed by the SEC and in the answer of Merrill-Stevens. This investigation consisted of an examination of numerous documents assembled by the SEC during its investigation, together with copies of statements made by individuals which had been obtained during the investigation. Also examined were numerous documents and statements furnished by Merrill-Stevens in support of its answer to the specifications of objections by the SEC." The trustee did not set out any findings of fact which he arrived at in the course of this "investigation," and provided no explanation of the reasoning which had led to his "considered opinion" that the M–S claims should be allowed in full.

boilers in it, somebody made a bad mistake. I don't know who it was."

The matter was put over, and subsequently the Committee, supported by the Commission, the Department of Justice, and the Caplan mortgage group, filed objections. Notwithstanding these objections, and the doubts that he had earlier expressed, the trial judge confirmed the claims in full as unsecured claims without further investigation of them. M–S, under the confirmed plan, is to receive 40% of the common stock of the reorganized company.

On July 11, 1962, the trial court filed its opinion and order approving both the internal and the cash plans of reorganization. The internal plan contained the provisions for "compromising" the Caplan mortgage and M–S claims. With regard to these sets of claims, the trial court stated that "it was apparent" that successful litigation of the claims TMT had against the holders of these claims "would take possibly years to conclude. . . ." The court continued:

"It is the opinion of the court that these compromises are fair and equitable under the circumstances and they are hereby approved for inclusion in the Internal Plan. The court approves the opinion expressed by the attorney for the trustee that no better compromises can be obtained for the debtor, that the prospect of material reduction in the amount of these claims does not warrant the extensive litigation that would otherwise be required, and that the prospect of recoveries beyond the amount of the claims as urged by the Securities and Exchange Commission and the Stockholders' Committee is too remote for serious consideration. . . . The alternative to approval of these compromises is extensive litigation at heavy expense to the debtor and un-

necessary delay in reorganization contrary to the intent and purpose of Chapter X of the Bankruptcy Act."

This statement constitutes the only, and the last,[16] word that the trial court said on the merits of the compromises of the Caplan mortgage and M–S claims. Without reference to any of the objections that had been filed or to the substantial facts in the record tending to cast doubt upon the Caplan mortgage and M–S claims, the court accepted the bald conclusions of the trustee. This despite the fact that the trustee had once concluded that the Caplan mortgage was null and void and that TMT had sizeable setoffs against its holders. This despite the fact that the trustee had once sought reference of the M–S claims to a special master for investigation. This despite the fact that the trustee had never placed on the record any of the facts of his subsequent investigation

---

[16] In December 1964, after the case had been remanded for the second time by the Court of Appeals, the Committee sought an order for production of documents relating to the *Carib Queen*, alleging they would show that TMT had a cause of action against M–S and the Caplan group. The Committee said these parties had acted "in collusion with members of the debtor's old management and control group to defraud the Maritime Administration and the debtor by misrepresentation of the reconversion contract price and by premature release of the vessel without proper compliance with the requirements of the reconversion contract. The same documents also bear on the propriety of the compromises . . . ." At the hearing held on this motion it appeared that these documents were held by the Maritime Administration, which had no objection to turning them over but wished the court to issue a formal order so that all parties could have access to them. The court denied the motion, saying "there is nothing in the motion that shows that these documents are material to any issue before this Court."

When reconfirming the plan after the second remand, the court added nothing to the explanation quoted in the text, for it erroneously concluded that approval of the settlement had already been affirmed by the Court of Appeals.

and had never provided any explanation of why he had completely reversed his field on these claims. Although at this point in the proceedings it was clear that Anderson was to become president of the reorganized company, and though the trial court was understandably eager to wind up these protracted proceedings, there nowhere appears an adequate explanation for the trustee's cursory, conclusory recommendation of these "compromises," or the perfunctory, almost offhand, manner in which the court accepted that recommendation.

If the quoted statement of the trial court had been the result of an adequate and intelligent consideration of the merits of the claims, the difficulties of pursuing them, the potential harm to the debtor's estate caused by delay, and the fairness of the terms of settlement, then it would without question have been justifiable to approve the proposed compromises. It is essential, however, that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law. Here there is no explanation of how the strengths and weaknesses of the debtor's causes of action were evaluated or upon what grounds it was concluded that a settlement which allowed the creditor's claims in major part was "fair and equitable." Although we are told that the alternative to settlement was "extensive litigation at heavy expense" and "unnecessary delay," there is no evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation. Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation. The complaint voiced by

counsel for the petitioner Committee to the trustee's report on the compromises, that "this is a bare statement of conclusion," seems equally applicable to the trial court's statement approving those compromises. In these circumstances it was error to affirm that aspect of the District Court's judgment approving inclusion of the proposed compromises in the internal plan of reorganization.

The Court of Appeals dealt with the District Court's approval of the compromises in five sentences. Noting that it was only the Committee and the SEC that were complaining, and remarking that it was unlikely that disallowance of the compromises would result in solvency, it felt that it was "significant that not a single creditor has ever complained of either compromise." 364 F. 2d 936, 941. The question of insolvency will be returned to shortly. The argument that the compromises were properly approved because no creditors objected to them seems doubly dubious. When a bankruptcy court either fails adequately to investigate potential legal claims held by the debtor, or refuses to provide an adequate explanation of the basis for approving compromises, it is scarcely surprising that creditors fail to come forward with objections to the compromises. Moreover, this Court has held that a plan of reorganization which is unfair to some persons may not be approved by the court even though the vast majority of creditors have approved it.[17]

---

[17] *Case* v. *Los Angeles Lumber Prods. Co.*, 308 U. S. 106 (1939). "[W]here a plan is not fair and equitable as a matter of law it cannot be approved by the court . . . . Congress has required both that the required percentages of each class of security holders approve the plan and that the plan be found to be 'fair and equitable.' The former is not a substitute for the latter." *Id.*, at 114.

The principal argument of the respondent support-
ing affirmance of the order approving the compromises
is that "the district court had before it a thorough
record concerning the facts and issues with respect to
the compromises of these two claims." Respondent's
Brief 38. With regard to the Caplan mortgage claim,
respondent points out that the facts and circumstances
surrounding it were thoroughly documented in Ander-
son's report of his investigation. It is difficult to see
how this strengthens respondent's position, however, for
the report carefully documented the conclusion that the
Caplan mortgage was a fraudulent transfer and that
claims against the individual holders of the mortgage
could be used as setoffs. The District Court's approval
of the proposed compromise in the face of the facts and
conclusions contained in the trustee's report is more
difficult to understand than would be approval entered
on a blank slate. Respondent also points out that the
trial court had before it an answer to Anderson's report,
the various objections filed to the mortgage claim, the
claim itself, and the recommendations of the Creditors'
Committee, the trustee and the trustee's counsel favoring
the proposed settlement. The objections filed to the
claim militate against the advisability of compromise,
however, and the other matters referred to consist either
of conclusory denials of liability or conclusory state-
ments that the claims should be compromised. There is
nothing in all these documents which could provide a
sound basis for concluding that the claims against the
mortgage and its holders were unmeritorious.[18] If the

---

[18] The answer filed to the Anderson report occupies seven pages
in the record. Aside from bare statements that insufficient facts
were found and that the trustee's conclusions were not conceded, it
opposes vacating the original plan of reorganization almost wholly
on grounds of estoppel, laches, *res judicata,* and reliance. The
claim itself merely details the terms of the mortgage and the amounts

trial court ever had before it facts which showed the claims against the Caplan mortgage and its holders to be without merit, or if the court ever discovered sound grounds for thinking that the delay incident to litigation or the unlikelihood of obtaining an adequate recovery, made compromise advisable, nothing in this record indicates it.

With regard to the M–S claims, respondent contends that the record contains "an abundance of pleadings and allegations" respecting them. Respondent's Brief 33. To make an informed and independent judgment, however, the court needs facts, not allegations. Respondent also contends that there were sufficient facts in the record, and provides a long list of references to the places in the record where these facts can be found. If, indeed, the record contained adequate facts to support the decision of the trial court to approve the proposed compromises, a reviewing court would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based. The deficiency in this case, however, is not a merely formal one. The evidence referred to by respondent is analyzed at greater length in the margin.[19]

---

due under it. The recommendations favoring settlement stated only that the merits of the claims had been examined, that the possibility of recovery was remote, and that litigation would cause "unnecessary delay."

. [19] Respondent contends that the trial court could have rendered an informed decision on the merits of the M–S compromise on the basis of the following matters in the record:

(1) *The summary of M–S' proof of claim* (the full proof not having been included in the record). This merely stated the amounts claimed by M–S and the liens asserted to secure some of the claims.

(2) *The 1958 letter from the Committee to the Court.* This asserted that TMT had good causes of action against M–S which would result in substantial recovery. With regard to the *Carib Queen,* it accused M–S of "faulty design, inadequate inspection, defective work on the remodeling and later repair of the ship, hasty

Here it is enough to say that to the extent that the record contains solid facts of the sort necessary for appraising the merits of the claims against M–S, virtually all of them point to the probable existence of valid

and improper preparations for a hazardous sea voyage and utilization of the ship in a service for which she was not fitted and in an unseaworthy condition."

(3) *The trustee's report.* This merely stated a few facts relating to the breakdown of the *Carib Queen* on her maiden voyage, and the expenses incurred in connection with the *Carib Queen.*

(4) *The SEC's specifications in support of the objections to the M–S claims.* This was a report of the SEC's independent investigation of the M–S claims. It set out in some detail the facts supporting its contention that TMT had good defenses or setoffs because "M–S (a) did not properly convert the vessel; (b) did not comply with the terms of the contract; (c) did not properly repair the vessel; and (d) performed certain work for and furnished certain materials to TMT, with no agreement as to price; M–S has failed to establish the value of such work and materials."

(5) *The M–S answer to these specifications.* This was principally a formal document and contained no additional facts or arguments. It admitted that the *Carib Queen* was suffering construction deficiencies when delivered to TMT and that there was a boiler failure on the first voyage, but denied liability.

(6) *The motion for allowance of the claim filed on behalf of the trustee.* This summarized the proceedings relating to the M–S claims. Noting that the SEC had filed detailed specifications of its objections, and that the special master appointed by the court had held no hearings, it stated that the trustee and his attorneys had examined the documents relating to the M–S claims. The motion stated that the trustee had tried unsuccessfully to get M–S to reduce its claims, that the possibility of recovering through litigation was remote, and that litigation would cause unnecessary delay. These conclusions were neither expanded upon nor explained.

(7) *Objections of the United States to the above motion.* The United States opposed the M–S claims on the grounds that none of them were entitled to secured status. They had arisen more than a year prior to the bankruptcy proceedings, and claims for reconstructing vessels do not give rise to maritime liens.

(8) *The transcript of the hearings held on the motion for allowance of the claims.* The transcript of this portion of the hearing

and valuable causes of action. Balancing these facts are nothing but bald assertions to the contrary and general conclusions for which foundations nowhere appear. Particularly noteworthy is the fact that, despite frequent

occupies five pages. Most of it was devoted to the question of how much time the Committee would be allowed for filing a memorandum objecting to the proposed compromise. The court was told that the trustee and his lawyers had looked at the relevant papers, that the possibility of recovery was remote, and that litigation would cause unnecessary delay. No facts or arguments to support these conclusions were presented. Counsel for the Committee objected that this was not a report but a bare statement of conclusion. The court indicated that someone had been at fault over the boiler breakdown.

(9) *The Committee's specification of objections to the M–S claims.* This 35-page report, 22 pages of which are devoted to the *Carib Queen* contract, was the result of an independent examination conducted by the Committee into the M–S claims. The Committee charged M–S with faulty design, construction, and repair of the *Carib Queen.* With regard to two other ships on which M–S worked for TMT, the Committee charged M–S with responsibility for the swamping of one on its trial trip, and with failing to get Coast Guard approval of the other. The Committee also claimed that the maritime liens asserted by M–S had been reduced by payments on account, and that the original TMT management, M–S, and Abrams and Shaffer had worked together in a collusive relationship designed to make large profits by selling cheaply purchased stock to the public at inflated values. Some idea of the factual particularity of the Committee's objections is provided by the abbreviated subheadings of their charges against M–S in connection with the *Carib Queen.* The Committee stated that TMT had causes of action growing out of the fact that M–S (a) failed to secure proper certificates of work completion affecting the classification and rating of the vessel, (b) failed to fit riveted crack-arresting seams, (c) failed to produce a vessel of 3,050 shaft-horsepower per shaft, propeller speed of 216 r. p. m., and speed in service of 15½ knots, (d) failed to produce a ship of high enough classification and rating, (e) failed to clean the boilers chemically, (f) wrongly assumed that the boilers had been properly protected up to the time of conversion, (g) failed to use distilled water in its preliminary running of the boilers, (h) improperly connected the

requests for an investigation, and notwithstanding the fact that the available evidence pointed to probably valid claims against M–S, no investigation of these matters was ever undertaken or ordered by the trial court. It is difficult to imagine how an informed and independent decision in favor of compromising the M–S claims in the full amount as unsecured claims could have been reached on the present state of the record.

The record before us leaves us completely uninformed as to whether the trial court ever evaluated the merits of the causes of actions held by the debtor, the prospects and problems of litigating those claims, or the fairness of the terms of compromise. More than this, the record is devoid of facts which would have permitted a rea-

---

piping, (i) installed incorrect baffle plates, (j) failed to clean the boilers adequately when performing the repair work, (k) failed to install the ventilating system properly, (*l*) installed an inadequate and inappropriate evaporator, (m) failed to put the feed water regulator and the feed pump governor into proper working order, (n) failed to install a boiler compound injector pump, (*o*) failed to provide equipment for coping with the excessive oxygen content of the water in the system, and (p) was responsible for deficiencies in the electrical system. In addition, the Committee stated that M–S was improperly claiming for repair work done under its guarantee obligation, and that M–S had included claims for work done as to which no amount had ever been agreed upon.

(10) *The statement by the SEC supporting the Committee's specification of objections.* The SEC, while not necessarily agreeing with all the allegations and contentions of the Committee, felt that the Committee had demonstrated that M–S should be required to prove its claims at a judicial hearing.

In addition to these matters of record, respondent refers to several matters not in the record, which are said to support the propriety of accepting the compromises. Matters not in the record and not properly the subject of judicial notice cannot form the basis of judicial confirmation of a plan of reorganization. They are equally unavailing on review.

soned judgment that the claims of actions should be settled in this fashion. In reaching this conclusion, however, it is necessary to emphasize that we intimate no opinion as to the merits of the debtor's causes of action or as to the actual fairness of the proposed compromises. To the contrary, it is clear that the present record is inadequate for assessing either, and that a remand is necessary to permit further hearings to be held. Only after further investigation can it be determined whether, and on what terms, these claims should be compromised.

## III.

Under §§ 174, 221 (2), of Chapter X, 52 Stat. 891, 897, 11 U. S. C. §§ 574, 621 (2), a bankruptcy court is not to approve or confirm a plan of reorganization unless it is found to be "fair and equitable." This standard incorporates the absolute priority doctrine under which creditors and stockholders may participate only in accordance with their respective priorities, and "in any plan of corporate reorganization unsecured creditors are entitled to priority over stockholders to the full extent of their debts . . . ." *SEC* v. *United States Realty & Improvement Co.*, 310 U. S. 434, 452 (1940). Since participation by junior interests depends upon the claims of senior interests being fully satisfied, whether a plan of reorganization excluding junior interests is fair and equitable depends upon the value of the reorganized company. In the present case the District Court excluded the stockholders from participation because of its finding that the debtor was insolvent. Since the determination of insolvency was not made in accordance with the proper standards of valuation, neither the approval nor the confirmation of the plan can stand.

The appropriate standard for valuing a company undergoing reorganization was set out at length in *Con-*

*solidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510, 526 (1941):

> "As Mr. Justice Holmes said in *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217, 226, 'the commercial value of property consists in the expectation of income from it.' . . . Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties. . . . The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. . . . Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance." [20]

In the present case the book value of the debtor's assets on May 31, 1962, was $1,887,185.77. Claims against the

---

[20] Further on the subject of valuation, see 2 J. Bonbright, Valuation of Property 880–881 (1937); 6A Collier, Bankruptcy ¶¶ 10.13 and 11.05 (14th ed. 1965); H. Guthmann & H. Dougall, Corporate Financial Policy 656–657 (4th ed. 1962). See also Frank, Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act, 18 N. Y. U. L. Q. Rev. 317, 342, n. 68 (1941): "Value is the present worth of *future* anticipated earnings. It is not directly dependent on *past* earnings; these latter are important only as a guide in the prediction of future earnings."

debtor totaled $5,477,370.05. The actual fair value of the debtor's total assets was $2,238,387.62 and their net value was $1,978,481.73. Although these figures show that liabilities far exceeded assets, they are not of controlling importance. The District Court recognized that going-concern value, not book or appraisal value, must govern determination of the fairness of the plans of reorganization, and respondent concedes that the value of TMT's business depended "not on the inherent value of its assets but primarily on maintaining a high level of earnings." Brief for Respondent 42.

At the valuation hearings the trustee stated that his analysis of the financial structure and business of the debtor resulted in a going-concern value of $2,031,403.72. A valuation expert presented by the trustee estimated the going-concern value at between $1,607,692 and $1,800,000. He arrived at his conclusion by multiplying his estimate of the future earnings of the company by 7.7, a figure based on the assumption that earnings would be 13% of value. The valuation expert presented by the Committee concluded that estimated future earnings after taxes would be $327,500, and multiplying this by a price-earnings ratio of 13.8, arrived at the conclusion that TMT had a value of $4,519,500. The trial judge took an intermediate position. By projecting current earnings of the debtor for the first five months of 1962 over the remainder of the year, he concluded that pre-tax earnings would be $568,000. Reduced by estimated income taxes and capitalized at 10%, this yielded a going-concern value of $2,780,000. Since this figure fell well below the $5,477,370.05 of outstanding claims, he concluded that the debtor was insolvent. On this basis the plan was approved and confirmed.

When the Court of Appeals remanded to the District Court for determination of the feasibility of the reorganization plan after giving full priority to the Govern-

ment's claims, the District Court concluded that TMT was "more insolvent now than it was in 1962," for earnings had declined from the high point of 1962, and the Court's initial determination had been based on the projected earnings for that year. The decline in earnings had occurred even though the volume of business had grown substantially, for increased competition from large steamship lines serving Puerto Rico had forced TMT to lower its rates and thus its margin of profit. The District Court reaffirmed its finding of insolvency. On appeal, the Court of Appeals stated that it did not have to determine whether or not the District Court's finding of insolvency was accurately computed, but merely whether it was "clearly erroneous." On this basis the conclusion of insolvency was affirmed.

In a complex case of this nature it is not the province of this Court to attempt to retry issues of fact which have been fully litigated below. Indeed, as the Court of Appeals stated, much weight must be given to the long familiarity of the District Judge with the debtor and to his evaluation of the witnesses who testified in his presence. In the face of conflicting expert testimony as to the going-concern value of the debtor based on current earnings, the trial judge adopted a position in between. We are not disposed to dispute the conclusion of the Court of Appeals that this determination by the trial judge was not "clearly erroneous." However, examination of the facts of this case demonstrates that the District Court did not have before it all of the evidence and testimony relating to the future problems and prospects of the company which were necessary to assess its value as a going concern. Indeed, the trial judge steadfastly refused to consider the value of the company once it was out of the reorganization proceedings. In this there was error, and it was an error which infected the conclusions of the trial court that the debtor was insol-

vent. Evaluations of evidence reached by the accurate application of erroneous legal standards are erroneous evaluations.

TMT plays a minor but unique role in carrying goods between Puerto Rico and the United States. This domestic offshore trade is highly competitive and generally unprofitable. The high density, high volume, and high operating-cost trade with Puerto Rico flows in and through the North Atlantic ports. TMT, operating in a triangle between San Juan, Miami, and Jacksonville, is confined to the low density, low investment South Atlantic trade. TMT carries only about 2% of the total trade with Puerto Rico, and the dominant carrier in the market is in direct competition with it in its home port of Jacksonville. When TMT entered the market with its novel idea of carrying roll-on and roll-off freight in towed vessels, the market was ripe for an innovation of this sort. However, the ills which plagued its early years threw TMT into bankruptcy in 1957. Prevented by the exigencies of the bankruptcy proceeding from capitalizing on the novel idea it had introduced, TMT has watched the development of container shipping, which has taken over a large share of the United States-Puerto Rico trade for which it might otherwise have hoped to compete. Nonetheless, TMT remains the only roll-on and roll-off carrier in the trade, and it has seen its own business rise 10% to 20% a year due to the increased frequency of direct interchange with piggyback rail transport. Despite the inability of TMT to capitalize on its novel idea, it has remained in a strong competitive position. Trade with Puerto Rico has increased steadily and rapidly, and TMT's business has grown commensurately. Despite a destructive rate war which markedly lowered the revenues earned per voyage, TMT increased its revenue from $3,801,000 in 1962, when the first insolvency hear-

ing was held, to $4,779,000 in 1964, the latest year in the record. Between the 1962 and the 1965 hearings the fleet of vessels was increased from three to five and the number of truck trailers from 350 to 670. Moreover, in the 1965 hearing the business manager could report that after it paid the forthcoming installment for the reconversion of one of its vessels, the company would have no further significant outstanding indebtedness. TMT has continued to be the only unsubsidized carrier in the South Atlantic trade, the only one that makes money. Despite the increase in volume and revenue, however, the rate war and other factors such as rising costs caused net earnings to drop after 1962, and they have not yet regained the level established that year. TMT's tax-loss carry-over has expired, with the result that earnings are now substantially reduced by federal taxes. The general trade picture between Puerto Rico and the United States is in flux, and the rates applicable to the trade are undergoing continuing revision and investigation. The vessels TMT uses are old and in need of replacement. The supply of LST's has nearly dried up, and it seems to be understood that the replacement vessels will have to be built from scratch.

In short, TMT would seem to be a company which has established, preserved, and increased its share of a highly competitive market despite intense competition and major internal crises. It operates in a market undergoing substantial change and is itself faced with the imminent need to re-equip its fleet. In these circumstances, an adequate notion of the going-concern value of TMT could be obtained only by looking to the future as well as the past. Against this background we must examine the information which the trial court had before it for assessing the future prospects of TMT. The basic source for information on these matters was, of course, the trustee and his business manager. A short summary of

the highlights of their testimony as it related to the future prospects of TMT will demonstrate the inadequacy of the information provided the trial judge for making this crucial determination.

At the first insolvency hearing the business manager attempted to estimate the earnings of the company for the next four years, but he made his projections solely on the business as it then was. Although TMT had attained the maximum number of voyages possible with the fleet it then had, the business manager had not looked into the possibility of chartering additional vessels. The trustee testified that several vessels would have to be replaced in the next two years, but admitted that he was unable to predict what such vessels would cost. When the trustee was asked if there was foreseeable room for expansion of TMT's business, the Court agreed with an objection that this was beyond the scope of the valuation hearing. The trustee's expert on valuation gave his opinion as to going-concern value solely on the basis of the trustee's projection of earnings, which in turn was based wholly on past earnings. Those earnings figures had been drawn up some time prior to the hearing, and it was conceded that they might have come out differently if the projection had been made at the time of the valuation hearing. When asked if he would attempt to predict whether the company would be able to pay dividends once it was out of reorganization, or whether large capital investments would soak up all earnings, the trustee's expert replied that he had not been asked to consider that question and did not think it legitimate. Although he agreed that reasonably foreseeable changes and improvements should be taken into account in valuing the company, he stated that he had been given no information on which to make such predictions.

At the second hearing on the value of the company, the business manager admitted that he had made no new projection of future expenses, revenue, or income, even though three years had passed and the business outlook of the firm was markedly different. Although TMT's fleet had grown in the interim from three to five vessels, and there was an imminent need for replacement of the older ships, the business manager was unable to predict the likely impact on earnings of the acquisition of newer vessels. He stated that the new vessels would be towed craft that loaded from the stern, and that they were apt to cost between $1,250,000 and $1,500,000 each. However, though some studies and inquiries had been conducted, there were no final or definite plans or drawings for the new ships. Although new, better, and more efficient vessels were needed soon to improve the company's competitive situation, in the present state of planning it would be two years after the company was out of reorganization before new vessels would be obtained. At the second hearing, as at the first, the business manager could give no estimate of what portion of the administration costs of running TMT was due to the reorganization proceedings. Although he thought that trade between the United States and Puerto Rico was increasing, he did not know how much or in what ways. Though he thought that TMT's share of the Puerto Rican trade was remaining comparatively constant, he did not know for certain. He also did not know what portion of TMT's present volume of business was attributable to direct piggyback interchange.

The data which the trustee and his business manager had submitted with regard to past income and expenses undoubtedly provided a clear picture of what the company had been experiencing in the past. Given, however, that it was a relatively small and young company

much in need of internal rebuilding and operating in a market undergoing important economic and technological change, it was essential that some clear idea be gained of its future prospects. It seems perfectly obvious that the information introduced at the two hearings was inadequate for gaining even a rough idea of TMT's future prospects.

The fundamental reason that there was insufficient evidence concerning the future prospects of TMT was that the trial court showed itself unalterably hostile to inquiries directed to TMT's future. During the first hearing the following interchange took place when the court cut off a question aimed at determining whether the volume of TMT's southbound traffic could be increased during the off-peak season:

> "Q. But if this enterprise were out from under the proceedings, would it?
>
> "The COURT. Well, we are dealing with an organization that is in. Let's assume that it will stay right there and try to get the value. It is not going to get out until it is reorganized.
>
> "Mr. MASON. We are trying to get the value when reorganized.
>
> "The COURT. That is of no importance to me. Let's value it as it now exists to determine what should be done in these proceedings."

At a later time, when counsel again sought to establish that the proper way to value the company was to try to determine foreseeable factors which would affect future earnings, the court pre-empted the answer by remarking, "Mr. Witness, we do not want possibilities." Still later, the judge said:

> "All these projections into the future are not going to bother the Court. These creditors have waited

too long to get their money. We have had this thing for years and years. I imagine most of them long since have gone to the poorhouse or given up."

One can easily sympathize with the desire of a court to terminate bankruptcy reorganization proceedings, for they are frequently protracted. The need for expedition, however, is not a justification for abandoning proper standards. It is also easy to share the court's concern that creditors receive their money as promptly as possible. However, the right of stockholders to participate at all hung on the result of the valuation proceedings; sedulously eliminating all inquiry into the future may, in this context, have caused the rights of the stockholders to have been relinquished by default.

Although three years elapsed before the next hearing, the judge displayed the same unwillingness to permit inquiry into the future prospects of TMT. When counsel for the SEC tried to open up the subject, the following dialogue occurred:

"Mr. GONSEN. We have no startling figures, but a series of questions relating to the possible future prospects of this company.

"The COURT. There is no possible future prospects other than what is going on. It is possible it will become the greatest fleet in the world and it is possible to go bankrupt in a few months. As a matter of fact, if the competition had succeeded in their plans, you would have no problem here, they would have been sold.

"Mr. GONSEN. Do I understand Your Honor does not desire me to examine as to evaluation?

"The COURT. You do."

Perhaps the proper reading of the reluctance of the judge to go into future prospects at the second hearing was that in his view the issue of insolvency was no longer in

the case. The Court of Appeals had ruled on the question of whether the trustee could be the president of the reorganized company and whether the Government's nontax claims should be allowed in full without discussing the other issues. In the trial judge's view, the Court of Appeals' failure to speak on other issues constituted affirmance. On the appeal from the second hearing, however, the Court of Appeals took pains to point out the error in this conclusion. The result of the trial court's ruling was to exclude from the hearing the general issue of insolvency and to limit the hearing to the question of whether developments between the first and second hearings had rendered the plan unfeasible in light of the necessity of giving full priority to the Government's nontax claims. In such circumstances it might be expected that the Court of Appeals would have examined the record to see if the facts supported the conclusion which the trial judge had felt foreclosed from having to make again, but which was in fact still in the case. Instead, however, the Court of Appeals merely quoted at length from the trial court's conclusions that the plan was feasible and stated that the ruling that the company was still insolvent was not clearly erroneous.

At the close of the second hearing the SEC and the Committee argued vigorously that the issue of valuation was still open and that future prospects should have been considered by the judge. Although its view of the effect of the appeal from the first hearing did not require it to do so, the court addressed itself to the merits of this contention in its opinion and order approving the amended plan of reorganization:

> "The SEC and the Stockholders Committee insist, as they did during the valuation hearings in 1962, that the court should have required evidence of future earnings, subsequent to reorganization, based upon estimates of revenues and expenses after sub-

452

stantial changes in operations and acquisition and substitution of new type vessels and other equipment, and based upon expanded operations expected to take place under private management. However, neither the trustee [n]or the court can anticipate what the reorganized company will do, and any estimates · of future earnings under different circumstances of operation would be speculative and unreliable."

This was not a correct statement or application of the law. This Court has declared that in every case it is incumbent upon the reorganization court to consider "all facts relevant to future earning capacity . . . including . . . all circumstances which indicate whether or not [the past earnings] record is a reliable criterion of future performance." *Consolidated Rock Products Co.* v. *Du Bois, supra.* If it is shown that the record of past earnings is not a reliable criterion of future performance, the court must form an estimate of future performance by inquiring into all foreseeable factors which may affect future prospects. In forming this estimate, "mathematical certitude" is neither expected nor required.

In this case we have a company engaged in a hotly competitive market, a market experiencing a severe rate war which would probably alter the relative standings of the competitors. The market as a whole was witnessing substantial technological change, and TMT itself was one of the prime innovators. TMT's principal market, Puerto Rico, was undergoing considerable expansion. It was shown without contradiction that TMT needed to replace its present fleet with new and different ships. It should have been clear to the trial court that the circumstances brought out at the two hearings showed that the past earnings record was not a reliable criterion of future performance, and that sound evaluation of the

company as a going concern required examination of the future prospects of the company. The court was not dealing with an established company in a static market, nor was it being asked to value the company's future prospects by hypothesizing unforeseeable changes in operations or market structure. It was evident that certain specific and predictable alterations would have to be made in the equipment and operations of the company in order to meet foreseeable alterations in the market. The trial court shut its eyes to these important developments and in so doing ignored a cardinal principle of proper evaluation.

## IV.

Because only past earnings were relied upon in this case in determining the value of the debtor as a going concern, we reverse and remand to the Court of Appeals with directions to remand to the District Court to hold new hearings on valuation. Without in any way prejudging the issue, it is possible that when the compromises discussed in Part II of this opinion are reconsidered, and when the company is properly valued by taking into account its future prospects, the company will be found not to be insolvent. Such a finding would permit stockholders to participate. There is, therefore, no point in considering at this juncture the question presented by the petitioner concerning the stockholders' claims under the federal securities laws. Since the Committee will, of course, be entitled to participate in the new hearings on valuation and insolvency, the order of the District Court discharging it is vacated. So doing, however, reflects no opinion on the merits of the arguments presented in this Court by petitioner as to why it should not have been discharged. Finally, there is no necessity to determine whether it was improper to contemplate making the trustee president of the reorganized company. A great deal of time has passed since that was deemed

an advisable plan, and intervening circumstances may well have altered the views of the participants. Since new hearings on valuation and insolvency will further protract these proceedings, it seems advisable to put that question aside.

For the reasons stated in this opinion, we reverse and remand to the Court of Appeals for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART and MR. JUSTICE FORTAS join, dissenting.

In my opinion, the only question which could be thought even remotely to justify the presence of this case in this Court is whether the trustee, by virtue of his office, was as a matter of law disqualified from being selected as president of the reorganized company. The Court, however, does not decide that question. The review of the massive record in these reorganization proceedings, which have been in the courts for over 10 years and on six occasions before the Court of Appeals at various stages, is not in my view an appropriate task for this Court. Believing that this decision bodes little but further delay in bringing this protracted proceeding to a conclusion, I feel justified in voting to dismiss the writ as improvidently granted, despite the fact that the case was brought here on an unrestricted. writ. Since the Court does not reach the "disqualification" issue, I consider it inappropriate for me, as an individual Justice, to express my own views upon it.