Dated:

In re ARCADIA MANUFACTURING, INC., Bankrupt.

Gene HOWARD, Trustee, Plaintiff,

v.

Matthew C. RICCIARDI, Joseph Parks, Charles Richard Parks, Terry Parks, and Omega Containers, Inc., Defendants.

Gene HOWARD, Trustee, Plaintiff,

v.

Joseph PARKS, Charles Richard Parks, Terry Parks, and Omega Containers, Inc., Defendants.

Gene HOWARD, Trustee, Plaintiff,

v.

Charles Richard PARKS and Joseph Parks, Defendants.

Bankruptcy No. B77–465–0 (Reopened).

United States Bankruptcy Court, W. D. Louisiana.

Sept. 22, 1982.

Chatham H. Reed, Shreveport, La., for plaintiff.

H. Russell Davis, Arcadia, La., for defendants.

Donald E. Walter, Shreveport, La., for objecting creditors.

## OPINION

RODNEY BERNARD, Jr., Bankruptcy Judge.

A joint application for approval of a compromise of this matter was filed on May 22, 1981 by Plaintiff, Gene Howard, Trustee, and Defendants, Matthew C. Ricciardi, Joseph Parks, Charles Richard Parks, Terry Parks, and Omega Containers, Inc. Objections to the proposed compromise were filed timely by United Ammunition Container, Inc. and Vincennes Paper Mills, Inc., both creditors of Arcadia Manufacturing, Inc., the debtor herein.

### Statement of the Case

The debtor herein, Arcadia Manufacturing, Inc., (hereinafter "Arcadia"), was incorporated in January, 1972. Arcadia was engaged primarily in the manufacture of ammunition containers. Arcadia encountered financial difficulties and was placed in state court receivership in 1976. This receivership was terminated upon the filing on March 15, 1977 of an involuntary proceeding in bankruptcy by United Ammunition Containers, Inc. (hereinafter "UAC"), Vincennes Paper Mills, Inc. (hereinafter "Vin-

cennes"), and TexStar Corporation. Joseph Parks was the sole shareholder and president of Arcadia at this time. His son Terry Parks, was the secretary-treasurer of Arcadia; and his son, Charles Richard Parks, was a vice-president in charge of production, quality control and maintenance for Arcadia. Matthew C. Ricciardi was not associated with Arcadia as a shareholder, officer or director.

In April, 1977, this proceeding was converted to a Chapter XI, and Gene Howard was appointed receiver. Soon thereafter, Mr. Howard made an inventory of the property that he had been shown as belonging to the estate. In July, 1977, Mr. Howard made an inventory of property shown to him as belonging to Joseph Parks, Charles Richard Parks and Matthew C. Ricciardi. This property was at the same location as the premises leased by Arcadia. Mr. Ricciardi claims that the property he allegedly owns is stored in space leased by him for that purpose in a different part of premises than that leased by Arcadia.

In August, 1977, Omega Containers, Inc. (hereinafter "Omega") was incorporated. Its original directors were Joseph Parks, Terry Parks, and Charles Richard Parks. Its two shareholders are Terry Parks and Charles Richard Parks. Omega operates out of the same premises Arcadia had operated from and, like Arcadia, is in the business of manufacturing ammunition containers.

In September, 1977, the Arcadia Chapter XI was converted to a liquidation proceeding, and Gene Howard was appointed trustee. In May, 1978, Mr. Howard filed the above-captioned complaints primarily for recovery of property, namely machinery and equipment claimed by defendants, Joseph Parks, Charles Richard Parks and Matthew C. Ricciardi, to be owned by them individually.[1] These three adversary proceedings have since been consolidated.

---

1. *Complaint # 1.* This is the complaint captioned "Gene Howard, Plaintiff, vs. Matthew C. Ricciardi, Joseph Parks, Charles Richard Parks, Terry Parks, and Omega Containers, Inc., Defendants". The property subject to this com-

plaint is itemized on an exhibit to the complaint and consists of machinery and equipment allegedly owned by Matthew C. Ricciardi.
*Complaint # 2.* This is the complaint captioned "Gene Howard, Plaintiff, vs. Joseph

In January, 1981, the plaintiff filed a supplemental complaint in the consolidated proceedings. He asserted that the corporate entities Omega and Arcadia should be disregarded and the individual defendants held liable for acts of fraud, including misappropriation and concealment of property of the estate.

In May, 1981, the joint application for approval of compromise, which is the subject of this opinion, was filed. On August 5, 1981, a hearing was held on objections to the proposed compromise. After two witnesses had testified, the hearing was continued to a later date. Shortly thereafter, the Court determined that a full-blown trial on the merits would defeat the purpose of a compromise. Thus, the Court decided that the following materials already in the record would provide a sufficient basis for determining whether to approve or disapprove the proposed compromise:

1. Pleadings and memoranda already in the record.
2. Pre-trial orders and attachments.
3. All documentary exhibits previously filed.
4. Transcripts of 205(a) examinations had.
5. Transcript of testimony heard on August 5, 1981.

Additionally, the Court requested the submission of the following items:

1. Financial statements of Matthew Ricciardi, Joseph Parks, and Charles Richard Parks.
2. Narrative of how the compromise was reached, to be prepared jointly by the trustee and defendants Ricciardi and the Parkses.

Upon reviewing these items in the record, the Court determined that it was not ap-

prised of all the facts necessary for determining whether the proposed compromise was fair, equitable and in the best interests of the estate. Accordingly, the record was reopened for the limited purpose of affording all interested parties an opportunity to present evidence concerning:

1. The value of equipment and machinery, the ownership of which is in dispute, taking into consideration whether there is a market for these items.
2. The value of the use of the aforementioned equipment and machinery by any of the defendants subsequent to the date of filing of the petition in bankruptcy.
3. The personal net worth of Matthew C. Ricciardi, Joseph Parks, Charles Richard Parks and Terry Parks.
4. The current net worth of Omega Containers, Inc.

In response to the reopening of the record, the Court received transcripts of depositions with numerous exhibits as well as memoranda from counsel for the plaintiff, defendants and objecting creditors. After thoroughly reviewing the record as it now stands, the Court is of the opinion that it has been apprised of all facts necessary for a decision on the joint application for approval of compromise.

### The Proposed Compromise

The proposed compromise is the result of many months of negotiations. According to the narrative supplied by the plaintiff and defendants, the plaintiff's original settlement offer was for $100,000.00. At that time, defendants counter-offered to settle for $10,000.00. Quite some time later, the plaintiff and his attorney conducted a thorough inspection of the bulk of the machin-

Parks, Charles Richard Parks, Terry Parks, and Omega Containers, Inc., Respondents". The property subject to this complaint is itemized on an exhibit to the complaint and consists primarily of machinery and equipment allegedly owned by Joseph Parks. This complaint also contains an objection to unsecured proofs of claim filed by Joseph Parks totalling $65,-128.77.

*Complaint # 3.* This is the complaint captioned "Gene Howard, Plaintiff, vs. Charles Richard Parks and Joseph Parks, Respondents". The property subject to this complaint is itemized on an exhibit to the complaint and consists primarily of machinery and equipment allegedly owned by Charles Richard Parks.

ery and equipment subject to the complaints and determined that the value of the property involved was substantially less than the plaintiff had originally thought. See Tr. of Hrg., Aug. 5, 1981, C. Reed, p. 22; Tr. of Depo., June 17, 1982, G. Howard, p. 28 and Ex. 10, 11, and 14, which are photographs of the equipment taken during the inspection. For this reason, the plaintiff offered to settle for $50,000.00 plus other terms and conditions. The defendants eventually accepted the proposal.[2]

Subsequent to the original proposed compromise, the defendants offered, in addition to the $50,000.00 and other terms and conditions, to turn over most of the items listed on the exhibit attached to Complaint # 2. The items not to be turned over are an air compressor and a transformer, both of which are in use. Other items from the list not to be turned over have not been located for various reasons. See Tr. of Depo., June 17, 1982, G. Howard, Ex. 13.

The Court has recently been informed of the death of defendant Matthew Ricciardi. This change of circumstances does not appear to affect the terms of the proposed compromise.

### Standards for Approval of Compromise

■ In determining whether a proposed compromise should be approved, a bankruptcy judge must compare the "terms of the compromise with the likely rewards of litigation". *Matter of Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir. 1980), citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d (1968). This requires an evaluation of the following factors:

(1) The probability of success in litigation, with due consideration for uncertainty in fact and law;

(2) The complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and

(3) All other factors bearing on the wisdom of the compromise.

*Matter of Jackson Brewing Co.,* 624 F.2d at 602.

■ In comparing the terms of this proposed compromise, as supplemented by the defendants' offer to turn over certain property, with the likely rewards of litigation, the Court is of the opinion that the application for approval of the compromise should be granted. As the following discussion will show, this compromise is fair, equitable and in the best interests of the estate.

### Probability of Success in Litigation
### Complaint # 1.

The likelihood of the plaintiff succeeding in litigation to recover the machinery and equipment subject to Complaint # 1 is extremely doubtful. Matthew Ricciardi has claimed ownership of these items. The transcript of his 205(a) Examination indicates that he purchased this equipment from other container manufacturers and stored it in rented space at the same location as the space leased by Arcadia. Mr. Ricciardi has attached to his answers to interrogatories documents from the companies he claims to have purchased this equipment from as proof of his ownership. Additionally, Exhibit D–4 to the transcript of Mr. Ricciardi's 205(a) Examination is an inventory supplied by Mr. Ricciardi that he claims to have taken on December 30, 1974

---

2. The proposed compromise agreement contains the following terms:
   1. The defendants shall pay plaintiff $50,000.00 in cash.
   2. The defendants' claims against the estate shall be classified as unsecured and allowed as such.
   3. All parties are to release each other fully and completely in regard to the issues presented by these suits.
   4. The defendants are to cooperate fully with the trustee in administering the estate, including cooperation in the estate's claim against the United States that is pending before the U. S. Court of Claims.
   5. If the trustee is not successful in the suit against the United States, claims numbered 4 and 5 of Joseph Parks will be disallowed.
   6. Joseph Parks will withdraw his claim numbered 12 as being a duplicate of claim number 5.

of some of his equipment that is stored in this rented space. The items on this inventory are the same as the items shown to plaintiff in July, 1977 as belonging to Mr. Ricciardi.

The plaintiff has made no allegations to support his right to possession of this equipment. He has not alleged that these items were carried on Arcadia's books nor that they were ever purchased by or contributed to Arcadia. In fact, the plaintiff's attorney has stated that the plaintiff thought Mr. Ricciardi intended to abandon these items and that the plaintiff filed this complaint to bring him into court to get a determination of his true intentions with regard to this equipment. Plaintiff's attorney further indicated that another purpose of the complaint against Mr. Ricciardi was to bring him in as a party for general discovery purposes because of his close association with the Parks family. See Tr. of Hrg., Aug. 5, 1981, C. Reed, pp. 11–13.

If, as appears likely, plaintiff was unable to disprove Mr. Ricciardi's ownership of these items, he would have to proceed on one of his alternate claims for recovering this property. Fraud and piercing the corporate veil, however, would appear to be inapplicable to Complaint # 1 because Mr. Ricciardi was not associated with Arcadia as an officer, director, or shareholder.

*Complaint # 2.*

As stated earlier, the majority of property subject to Complaint # 2 has been offered to the estate as part of the modified compromise by the defendants. Exhibit 12 to Gene Howard's deposition of June 17, 1982 shows the two items exempted from this offering. These are an air compressor and a transformer. Exhibit 11 to the transcript consists of pictures of the items offered. By matching these items to those listed on the exhibit to Complaint # 2, it appears that the majority of the items on that list are included in the offering. The remainder of the items subject to Complaint # 2 have not been located by the plaintiff. Joseph Parks, Charles Richard Parks, and Terry Parks supplied information as to the disposition of these items in an exhibit to their answer to interrogatories. See also Tr. of Depo., June 17, 1982, G. Howard, Ex. 13. Joseph Parks claims that some of the items were damaged in transit and returned to Mr. Ricciardi. A carrier's loss and damage investigation report that is part of Exhibit 13 to Gene Howard's deposition supports this claim.

The plaintiff has alleged that the machinery and equipment subject to Complaint # 2 were acquired by Arcadia as a contribution to capital and were carried on Arcadia's books and records. While there is a greater likelihood of succeeding in litigation on this claim, the value of this claim and other factors as discussed below still justify approval of the proposed compromise.

*Complaint # 3.*

The likelihood of the plaintiff succeeding in litigation on Complaint # 3 is doubtful. Charles Richard Parks has claimed ownership of most of the items listed on the exhibit to the complaint. Attached to his answers to interrogatories is a bill of sale to him from Matthew Ricciardi. While there was some question as to whether this bill of sale is the original bill of sale, Mr. Ricciardi's testimony in his 205(a) Examination indicates that it was the original bill of sale and that he made the sale to Charles Richard Parks but was only partially paid by Charles Richard Parks for these items. Mr. Ricciardi claims he never received payment for the remainder of the amount due.

The plaintiff has alleged that these items were contributed to Arcadia, but he did not allege in Complaint # 3 that these items were carried on Arcadia's books and records as he had alleged with respect to the items subject to Complaint # 2. The difficulty in disproving ownership of these items by Charles Richard Parks makes it unlikely that plaintiff could prevail on this claim.

If forced to proceed on his theory of fraud or disregarding the corporate entity in order to recover the equipment subject to Complaint # 2 or Complaint # 3, or the value of that equipment, the plaintiff's burden of proof would be very difficult to meet. A claim of fraud is a very serious

charge that must be established by exceptionally strong proof. *Cryer v. Cryer,* 297 So.2d 259 (La.App.1974). There must be clear and convincing proof of fraud, not simply a preponderance of the evidence. *Karst v. Fryar,* 361 So.2d 1344 (La.App. 1978), *writ denied* 364 So.2d 602 (La.1978) and 364 So.2d 603 (La.1978). It does not appear from reviewing the record and the Pre-Trial Order, which outlines the disputed issues and witnesses to testify and exhibits to be introduced at trial, that the trustee has such strong evidence to support his claim.

██ Absent fraud, such circumstances as commingling of funds, failure to follow statutory formalities for incorporation and transacting corporate affairs, and undercapitalization may warrant piercing the corporate veil. *Kingsman Enterprises, Inc. v. Bakerfield Electric Co., Inc.,* 339 So.2d 1280 (La.App.1976). However, when no fraud is proven, the totality of these other circumstances "must be so strong as to clearly indicate that the corporation and shareholder operated as one". *Id.* at 1284. Proof of inadequate capitalization does not, of itself, indicate fraud. *McGregor v. United Film Corp.,* 351 So.2d 1224, 1229 (La.App.1977). Again, it appears very doubtful that the plaintiff has sufficient evidence to succeed in litigation on this theory.

### Complexity, Duration, Expense, Inconvenience and Delay of Litigation

Even if the plaintiff were able to overcome the problems of proof discussed above and succeed in his claims for recovery of property, the possibility of such recovery being worth substantially more than $50,-000.00 is highly uncertain. Alternatively, if plaintiff were to recover the value of the property rather than the property itself, the problem of proving its value would be a very complex matter. The Court has before it information on the value of this property from three people: Gene Howard, plaintiff and trustee; Matthew Ricciardi, defendant, alleged owner of some of the property and seller to the other defendants of most of the remainder of the property;

and Jeffrey Perelman, Board Member, Vice President and Chief Operating Officer of UAC, one of the objecting creditors and competitor of Arcadia and Omega.

Mr. Howard's expertise in determining the value of machinery and equipment is based on his eight years experience as a trustee in bankruptcy. See Tr. of Depo., June 17, 1982, G. Howard, pp. 4–5. He has been involved in the reorganization and liquidation of many business entities, including the liquidation of a business engaged in the manufacture of cardboard boxes and a business engaged in the manufacture of steel tubing. Among the items sold by Mr. Howard at public auction in the liquidation of these two businesses were machinery and equipment similar in nature to some of the machinery and equipment at issue in this proceeding. See Tr. of Depo., June 17, 1982, G. Howard, pp. 49–59.

Additionally, Mr. Howard conducted a public auction of the machinery and equipment of Arcadia on October 25, 1977. The items sold at this auction included many pieces of machinery and equipment similar to the property at issue in this proceeding. Notice of the auction was published in newspapers in the two largest cities near Arcadia. Notice was also sent to parties on the auctioneer's mailing list as well as to parties in many areas of the country whose names were on a list furnished to the trustee by UAC. The list supplied by UAC was taken from the 1976–77 "Manufacturers, Products of the Composite Can and Tube Industry", which contains the names and addresses of businesses in related industries that might have a use for some of Arcadia's machinery and equipment. See Tr. of Depo., June 17, 1982, G. Howard, pp. 13–16 and Ex. 4, 5, 6, 8 and 9.

The values placed on the property by Mr. Howard are based on liquidation or quick sale value. See Tr. of Depo., June 17, 1982, G. Howard, pp. 6–7. Mr. Howard's use of this evaluation method is based on his experience with liquidation sales of highly specialized machinery and equipment. He has found that liquidation sales tend to bring substantially less than the values submitted

by the debtor as well as an amount less than his own appraisal value.[3]

Mr. Howard has placed a liquidation value of $9,400.00 on the machinery and equipment subject to Complaint # 1. See Tr. of Depo., June 17, 1982, G. Howard, pp. 24–25. In the exhibit to Complaint # 2, Mr. Howard had originally valued the machinery and equipment subject to that complaint at $151,400.00 based upon the values given by Matthew Ricciardi in his 205(a) Examination. After locating, inspecting and photographing most of the items, Mr. Howard determined them to be of very little value. Some of them were stored outside and were gathering rust and dirt. They did not appear to Mr. Howard to be in usable condition. Others were stacked in a warehouse. Except for the air compressor and transformer, the items were not in use at the time of this inspection. Mr. Howard has not revalued those items because the defendants have offered to turn them over to him in addition to the terms of the proposed compromise. Mr. Howard has placed a liquidation value of $8,850.00 on the machinery and equipment subject to Complaint # 3. See Tr. of Depo., June 17, 1982, G. Howard, pp. 23–31, 77, and photographic exhibits.

Matthew Ricciardi's expertise in valuing the type of machinery and equipment involved in this proceeding is based on his many years in the container industry and his own business of producing, buying and selling this type of equipment. See Tr. of 205(a), Exam., Dec. 8, 1977, M. Ricciardi, pp. 5–21. It is possible, however, that this testimony is biased because of Mr. Ricciardi's close association with both UAC and the Parks family.

Mr. Ricciardi does not appear to have placed a value on the items involved in Complaints # 1 and # 3. His valuation of the items he sold to Joseph Parks in April, 1971 for $56,750.00 is contained in the transcript of his 205(a) Examination dated December 8, 1977, at pp. 85–93, and was summarized by the plaintiff as his exhibit to Complaint # 2. Mr. Ricciardi has placed a value of approximately $141,400.00 on the equipment he sold to Joseph Parks. His figures do not appear to be based on first-hand knowledge of the condition of the machinery and equipment that he sold to Joseph Parks six years earlier. Mr. Ricciardi's testimony indicates that some of this machinery is expensive to produce and that it does not resell for much because it is so specialized. Although Mr. Ricciardi claims this equipment was worth more than he sold it for, he stated that the price of $56,750.00 was his bottom-line price and was a negotiated price between himself and Joseph Parks. Mr. Ricciardi also stated that some of this machinery was in good condition and some was in poor condition at the time he sold it to Joseph Parks. Tr. of 205(a) Exam., Dec. 8, 1977, M. Ricciardi, pp. 5–55, 85–93. Because Mr. Ricciardi is now deceased, he would not be available to testify at trial if this matter were litigated.

Jeffrey Perelman was offered by the objecting creditors as an expert in buying and selling equipment used in the manufacture

**3.** Following is a list of the specialized machinery and equipment sold at the public auction of the Arcadia estate and a breakdown of the values given by Arcadia, the appraised value by Gene Howard, and the auction sale price.

| ITEM | ARCADIA'S VALUE | TRUSTEE'S APPRAISAL | AUCTION SALE PRICE |
|------|------|------|------|
| Cut-off saw | $  600 | $  300 | $  100 |
| Winder | 4,000 | 500 | 200 |
| Conveyor | 5,500 | 200 | 500 |
| Seamer | 375 | 300 | 100 |
| Seamer | – | – | 25 |
| Seamer | – | – | 25 |
| Glue pot | 1,200 | 100 | No bid |
| Punch Press | 1,200 | 300 | 400 |

| ITEM | ARCADIA'S VALUE | TRUSTEE'S APPRAISAL | AUCTION SALE PRICE |
|------|------|------|------|
| Punch Press | 2,500 | 300 | 200 |
| 3 Punch Presses | – | – | 300 |
| Bliss Press | 650 | 100 | 50 |
| Recutter | 2,700 | 100 | No bid |
| TOTALS | $18,725 | $ 2,200 | $ 1,900 |

of containers, specifically with reference to ammunition containers. Mr. Perelman's primary experience in this area has been in reselling equipment that UAC purchased after the M. C. Ricciardi Co. bankruptcy liquidation in 1976. As already mentioned, Mr. Perelman is an officer and board member of UAC. Because of this association, the Court is of the opinion that, while Mr. Perelman may have some expertise in this area, his testimony would probably be given little weight if he were offered as an expert in the litigation of this matter. There is sufficient evidence in the record to show that Omega is now UAC's only serious competitor in the ammunition container manufacturing industry. The Court could not overlook the possibility of bias in Mr. Perelman's testimony.

Mr. Perelman did not place a value on the equipment involved in Complaint # 1. He did place a value of $244,000.00 on the equipment subject to Complaint # 2 and a value of $227,500.00 on the equipment subject to Complaint # 3. See Tr. of Depo., June 22–23, 1982, J. Perelman, pp. 135–139. Aside from the likelihood of bias, there are a number of problems with Mr. Perelman's valuations. Mr. Perelman has not inspected this equipment since the filing of the petition in bankruptcy and had not closely inspected it prior to that time. His valuations assume that every item is in good, working condition. This assumption is in conflict with the testimony of Gene Howard, Matthew Ricciardi, the Parkses and the photographic exhibits supplied by Gene Howard. In some instances, Mr. Perelman has assumed a top-of-the-line brand name in determining value even though none was given. He has also assumed that an item was of a large size even though the item is available in much smaller sizes and no size was given. See Tr. of Depo., June 22–23, 1982, J. Perelman, pp. 59, 99, 118–121.

Another problem with Mr. Perelman's valuations is that they reflect prices he has received on similar items sold under much different circumstances than a liquidation sale. He has taken years to sell much of the equipment UAC had purchased in the M. C. Ricciardi Co. liquidation, and many of

his sales are to foreign manufacturers who call on him periodically to make purchases. Unfortunately, a trustee in bankruptcy does not have the option of selling at his leisure. Administration of bankruptcy estates is to be handled in an expedited manner. Therefore, it would appear that the liquidation value is the value owing to the estate assuming it could be proven that the estate had a right to the property involved in these complaints. The mere fact that UAC was able to purchase the M. C. Ricciardi Co. equipment for $400,000.00 during its liquidation and then turn around and slowly sell just the "excess" for $250,000.00 or $300,000.00 should indicate the difference between liquidation value and fair market value absent distress circumstances. See Tr. of Depo., June 23–24, 1982, J. Perelman, pp. 8–11, 14–17, 27–29, 101–106.

Adding to the complexity of litigating this matter is the fact that many of these items are "home-made" and do not have serial numbers. Also, in some instances, one item has been put in working condition by taking parts from other equipment of the same type, rendering those items that have been "cannibalized" almost worthless. Tracing ownership under these circumstances would be practically impossible.

One estimate of the duration, expense and delay that would be incurred in litigating this matter has been offered by the plaintiff's attorney. He predicts that it would take one to two weeks to try this matter. He further predicts that there would be an appeal to the District Court and, possibly, the Fifth Circuit. The Court finds these to be reasonable estimates in light of the number and length of depositions already before it as well as the fact that the defendants have already taken two appeals during the course of this proceeding. Based on his predictions about the litigation, the plaintiff's attorney estimates that the estate's legal fees would be approximately $15,000.00 to $20,000.00. Thus, the value of any collectible judgment would be reduced by this amount. On the other hand, if judgment were in favor of the defendants, the funds to be distributed to

unsecured creditors would be reduced by this amount.

### Other Factors Bearing on the Wisdom of Compromise

The objecting creditors have attempted to show by implication through the deposition of their own employee that the Arcadia estate should have contained more machinery and equipment than the combined amount of what was sold at the public auction and the property subject to these complaints. The implication of this testimony is that the defendants have fraudulently concealed such property from the trustee. See Tr. of Depo., June 22, 1982, J. Erdie, pp. 30–72. This claim appears to be outside the scope of the three complaints that are subject to the proposed compromise. Even if this claim is within the scope of the complaints, it seems to be based on mere conjecture with no clear evidence to support it. One explanation of this situation is that many pieces of equipment were loaned to Arcadia by Mr. Ricciardi, as shown by the "on loan" invoices in the record. Joseph Parks testified that loans of equipment were made to Arcadia by Mr. Parks' brother at UAC as well as by Mr. Ricciardi. See Tr. of Depo., June 21, 1982, J. Parks, pp. 12–13. Another explanation is that one piece of equipment can be used to make different types of containers. See Tr. of Depo., June 22, 1982, J. Erdie, pp. 94, 99, 104.

The value of the use of the equipment involved in these complaints would only be a factor if it were determined that the estate had a right to recover this property and if this property was actually in use by the defendants. Thus, this is a relatively minor consideration given the substantial doubt that the plaintiff could succeed on Complaints # 1 and # 3 and given the evidence showing that most of the equipment involved in Complaints # 1 and # 2 has been sitting idle.

Even if the plaintiff were to succeed in litigation, the question remains of the collectibility of a substantial money judgment should the plaintiff be given that option instead of the property itself. Whether a judgment substantially in excess of $50,000.00 would be even partially collectible would depend on which individual defendants were found liable for fraud or disregarding the corporate entity. If all three Parkses were found liable, which seems doubtful, their financial statements indicate that the plaintiff might be able to collect a sizeable sum. If only one of the Parkses was found liable, it is quite doubtful that the collectible amount would be greater than $50,000.00.

The proposed compromise provides that the defendants are to cooperate fully, voluntarily and actively with the trustee in the lawsuit of the estate against the United States. It appears that the value of this lawsuit to the estate is between $700,000.00 and $1.1 million. The plaintiff's attorney believes this is an important part of the compromise. See Tr. of Hrg., Aug. 5, 1981, C. Reed, pp. 35–38. The Court is in agreement that if the voluntary and active participation of the defendants will increase the chances of success in that litigation, the best interests of the estate will have been served.

One of the most disturbing aspects of the controversy over approval of the proposed compromise is that the only two objecting creditors are UAC and Vincennes. These creditors are two of the three creditors that initially put Arcadia into involuntary bankruptcy proceedings. UAC, Vincennes, Ajax Paper Tube Company, and American Paper Products are all owned by the Perelman family. As mentioned earlier, UAC is the leading manufacturer of ammunition containers. Ajax Paper Tube Company and American Paper Products have also been involved in this industry. Aside from some very minor companies, Arcadia was, and Omega now is, UAC's only competitor. See Tr. of Depo., June 22, 1982, J. Erdie, pp. 4–14.

UAC's and Vincennes' claims against the estate total under $17,000.00, while total unsecured claims are almost $500,000.00. Although most creditors did not voice approval of or objection to the proposed com-

promise, a few of the larger unsecured creditors did submit motions for approval of the proposed compromise. Among those seeking approval are Packaging Corporation of America, with a claim for $96,119.91, Alton Box Board Company, with a claim for $29,197.83, and TexStar Plastics, Inc. with a claim for $11,536.68. A review of the record will show that UAC, Vincennes and their attorneys have spent an inordinate amount of time pursuing this matter. The Court cannot help but question the reasonableness of their views in light of the other creditors' reactions to the proposed compromise.

In the final analysis, the Court is of the opinion that the terms of the proposed compromise are of much greater value to the estate than the likely results of litigation in this matter. Therefore, the application for approval of the compromise is hereby granted, and the objections to the proposed compromise are hereby overruled.