In re Michael E. WOODSON, Debtor.

Michael E. WOODSON,
Debtor–Appellant,

v.

FIREMAN'S FUND INSURANCE
COMPANY, Appellee.

FIREMAN'S FUND INSURANCE
COMPANY, Appellant,

v.

Michael E. WOODSON,
Debtor–Appellee.

Nos. 86–1524, 86–2775.

United States Court of Appeals,
Ninth Circuit.

Argued July 16, 1987.

Submitted Aug. 17, 1987.

Decided Feb. 16, 1988.

Margaret Sheneman, Murphy, Weir & Butler, San Francisco, Cal., for appellant Fireman's Fund Ins. Co.

Sheridan Downey, II, Bell, Rosenberg & Hughes, Oakland, Cal., for debtor-appellee Michael E. Woodson.

Before ANDERSON, NORRIS and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider procedural and substantive questions raised by a creditor's objection to a debtor's claim that the proceeds of his deceased wife's life insurance policy, received within 180 days after filing for bankruptcy, are exempt assets under federal and California law.

### FACTS

On August 24, 1984, Michael Woodson filed a petition for a chapter 11 reorganization. Three days later, Woodson's wife Patricia died of brain cancer, and on Sep-

tember 8, 1984, he collected $1,017,764.99 as the proceeds of an insurance policy he had taken out insuring her life.

More than a month later, on October 9, 1984, Woodson filed schedules with the bankruptcy court listing his assets and liabilities as of August 24, the petition date. On Schedule B-4, "Property Claimed Exempt," Woodson listed the life insurance policy and described its exempt value as "All benefits other than loan value (Unmatured at date of filing)." Excerpt of Record (ER) 1. Woodson cited Cal.Civ. Proc.Code § 704.100(a) (West 1987) as the basis for his claim of exemption.[1] None of the papers filed October 9 contained an explanatory comment, footnote or supplement indicating that the policy insured the life of Mrs. Woodson or that the debtor had collected over $1 million in cash a month earlier. *See* Attachment to Schedule B-2, Clerk's Record (CR) 28, at 2; Schedule B-4, ER 1.

About a week after Woodson filed his personal chapter 11 petition, his corporation, the Woodson Company, a licensed mortgage broker, followed suit. William B. Grover was appointed trustee to manage the company's estate; Woodson remained debtor in possession of his own estate. The company had two principal groups of creditors: the Official Unsecured Creditors Committee and a group of 118 secured lenders represented by attorney James A. Duckworth. Woodson also had two principal creditors: appellant Fireman's Fund Insurance Company, which owned over 90 percent of the claims against Woodson, and Grover, the Woodson Company's trustee.

On October 24, 1984, there was a meeting of Woodson's personal creditors. *See* 11 U.S.C. § 341 (1982); Bankr.R. 2003(a). At the meeting Woodson acknowledged that his wife had died and that he had received the policy proceeds. Shortly thereafter, Grover and Duckworth filed objections on behalf of the company and its creditors to Woodson's claim to the insurance proceeds. They argued that Woodson could not exempt the proceeds and, because the company had paid the premiums on the

policy, the proceeds should be held in a constructive trust for the company and its creditors.

On January 10, 1985, Woodson filed with the bankruptcy court a document titled "Debtor's Supplemental Schedule Respecting Receipt of Exempt Life Insurance Proceeds [Bankruptcy Rule 1007(h)]." It disclosed Woodson's receipt of the life insurance proceeds and claimed that the entire amount was exempt under Cal.Civ.Proc. Code § 704.100 (West 1987). The supplemental schedule was served only on Duckworth and David Chandler, an attorney for the company's trustee; it was not served on Fireman's Fund or any of Woodson's other creditors.

The bankruptcy court scheduled a hearing on the objections for January 16, but the hearing was continued to February 13. On February 11, Fireman's Fund prepared and signed a document titled "Memorandum of Law in Support of Objection to Claim of Exemption of Life Insurance Proceeds." Fireman's Fund mailed the document to the bankruptcy court in Eureka, California that day; it arrived the following day and the clerk stamped it as filed on February 12. On February 11, Fireman's Fund also hand-delivered copies of the document to Woodson, Grover, Duckworth and the deputy clerk in Santa Rosa, California, where the bankruptcy judge was scheduled to sit. Fireman's Fund argued, inter alia, that the policy proceeds were not exempt and therefore belonged to Woodson's estate, not to Woodson.

At the February 13 hearing, Grover and Duckworth proposed that Woodson give $100,000 of the policy proceeds to the company's estate and its creditors. Under this plan Woodson would keep the balance of the $1 million and his own chapter 11 estate would receive nothing. Because the lawyers lacked authorization from their clients, the compromise was not adopted and the hearing was continued until March 20.

Fireman's Fund subsequently rejected the compromise proposal. Nonetheless, on March 11, 1985, counsel for Woodson, Gro-

---

**1.** That subsection provides:

Unmatured life insurance policies (including endowment and annuity policies), but not the loan value of such policies, are exempt without making a claim.

ver, Duckworth and the unsecured creditors committee filed a motion seeking authorization for the compromise. The court granted the motion at the March 20 hearing and approved the compromise as binding in both the Woodson and Woodson Company cases the following day. On March 29, it rejected Fireman's Fund's claim that the insurance proceeds were not exempt and denied its objection to the compromise.[2]

Fireman's Fund appealed to the district court (Williams, J.), which, on November 1, 1985, reversed the bankruptcy court, holding that the proceeds were property of Woodson's estate under 11 U.S.C. § 541(a)(5)(C) (1982) because they were acquired within 180 days after the filing of the bankruptcy petition, and that Woodson was entitled only to the amount necessary to support him and his children under Cal. Civ.Proc.Code § 704.100(c).[3] The district court also vacated the bankruptcy court's order approving the compromise. The court noted, however, that Fireman's Fund's objection may not have been timely and therefore remanded to the bankruptcy court for a determination of that issue. Woodson appealed the district court's substantive rulings but we stayed the appeal pending the district court's determination as to whether Fireman's Fund's objection was timely.

After briefing and a hearing, the bankruptcy court held that Fireman's Fund's objection was untimely. The district court (Lynch, J.) affirmed the bankruptcy court's decision and Fireman's Fund appealed. That appeal and Woodson's appeal on the merits have been consolidated before us.

**CONTENTIONS OF THE PARTIES**

Fireman's Fund argues that its objection to Woodson's claim of exemption was timely, having been effectively filed within 30 days after Woodson filed his claim of exemption to the $1 million. On the merits, it

contends that federal law draws the life insurance proceeds into Woodson's estate and that California law permits an exemption only to the extent necessary to support Woodson and his children. In addition, it contends that the bankruptcy court abused its discretion in approving the compromise because it relied on an incorrect interpretation of the law and because the compromise allocated nothing to Woodson's personal creditors.

Woodson, for his part, urges us to affirm the decision that Fireman's Fund's objection was untimely. On the merits, he contends that the life insurance proceeds are totally exempt. In any event, he urges us to reverse the district court on the merits and uphold the compromise approved by the bankruptcy court.

**DISCUSSION**

**1. Timeliness of the Objection**

The bankruptcy court, affirmed by the district court, ruled that Fireman's Fund's objection was untimely because it was filed on February 12, 1985, far more than 30 days after the October 24 creditors' meeting that, in the court's view, triggered the creditors' right to object to Woodson's claim of exemption. However, Bankruptcy Rule 4003(b) provides "[t]he trustee or any creditor may file objections to the list of property claimed as exempt within 30 days after the conclusion of the meeting of creditors held pursuant to Rule 2003(a) *or the filing of any amendment to the list....*" Bankr.R. 4003(b) (emphasis added). Quite clearly, the rule contemplates that objections will be raised within 30 days of the meeting of creditors only as to exemptions scheduled before that meeting. Where the asset is not scheduled until after the meeting, the creditors' right to object does not arise until the debtor amends the schedule and makes a formal claim of exemption.

Here, Woodson did not make his claim of exemption as to the $1 million before the October 24 creditors' meeting. As noted,

---

**2.** In staying approval of the compromise pending appeal, the bankruptcy court ordered the transfer of $100,000 to Grover but prohibited disbursement of any interest or principal. The court also released $400,000 of the $1 million to Woodson free of restrictions, and gave him the interest on the remaining $500,000. *See* 2 Supplemental ER 2 (order of March 29, 1984); CR 165 (order of April 2, 1984).

**3.** Cal.Civ.Proc.Code § 704.100(c) provides:

Benefits from matured life insurance policies (including endowment and annuity policies) are exempt to the extent reasonably necessary for the support of the judgment debtor and the spouse and dependents of the judgment debtor.

he made no mention that he had received over $1 million in life insurance proceeds when he filed his original schedules, although he well could have. Mrs. Woodson died on August 27 and Woodson received the cash on September 8. Woodson's original schedules were not filed until October 9, a month later. He specifically mentioned his wife's death in his statement of financial affairs, also filed the same day, in describing a joint checking account. CR 30a, at 2. However, he failed to mention her death in describing the insurance policy; indeed, he did not even disclose whose life the policy insured.

There can be no doubt that Woodson was required to list the $1 million in his schedules promptly. "Within ten days after the information comes to the debtor's knowledge ... the debtor ... *shall file a supplemental schedule* with respect to any property that the debtor acquires or becomes entitled to acquire within 180 days after the date of the filing of the petition ... (3) as a beneficiary of a life insurance policy or of a death benefit plan." Bankr.R. 1007(h)(3) (emphasis added).[4] While Woodson might well have been excused from acting within the prescribed 10 days because he had not yet filed his original schedules, he had no justification for failing to disclose receipt of the $1 million in his schedules when he did file them. The leading bankruptcy treatise notes that "[p]roperty acquired by the debtor after the filing of the petition but prior to the filing of the schedules should be included if within the provisions of section 541 [property of the estate]." 3 *Collier on Bankruptcy* ¶ 521.06[3], at 521–22 (15th ed. 1987) (*Collier*). We join in this self-evident advice.

Woodson's failure to notify his creditors of the $1 million in a timely fashion is especially troubling because Woodson is not an ordinary litigant. As debtor in possession he is the trustee of his own estate and therefore stands in a fiduciary relationship to his creditors.[5] As such, Woodson is required to turn square corners and avoid conduct that would prejudice the rights of those whose interests he is required to protect. As *Collier* notes, "[t]he scheduling of interests in property, both real and personal, is a very important duty, and the intentional and fraudulent omission of property from the sworn schedules will amount to an offense punishable under the Criminal Code...." 3 *Collier* ¶ 521.06[3], at 521–24; *see Payne v. Wood*, 775 F.2d 202, 205 (7th Cir.1985) ("[t]he operation of the bankruptcy system depends on honest reporting"), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986). At the very least, such omission violates the trustee's fiduciary duty. Woodson did not finally get around to filing a supplemental schedule until some four months had passed. No explanation or excuse was offered, and no leave of court was sought, for the inordinate delay. We conclude, therefore, that Fireman's Fund's time to object under Bankr.R. 4003(b) did not run from the date of the creditors' meeting but from the date Woodson finally amended his schedules to list the $1 million and made a formal claim of exemption.

---

4. Woodson makes the curious argument that "it is uncertain whether Bankr.R. 1007(h) required him to file a pleading describing the disposition of an asset," but that he "did so anyway, abiding by the literal dictate" of the rule. Brief of Appellee and Appellant, Michael E. Woodson at 14–15 (Woodson Brief). Why Woodson finds the need to comply with the "literal dictate" of the rule "uncertain" is puzzling; it is difficult to imagine a clearer command.

5. *See* 11 U.S.C. § 1107(a) (1982) (debtor in possession plays same role as trustee where trustee is not appointed); Bankr.R. 9001(10) (" 'Trustee' includes a debtor in possession in a chapter 11 case"); *United States v. Technical Knockout Graphics, Inc. (In re Technical Knockout Graph-* *ics, Inc.)*, 833 F.2d 797, 802 (9th Cir.1987) ("[t]he debtor-in-possession is not free to deal with [after-acquired] property as it chooses, but rather holds it in trust for the benefit of creditors, just as would a trustee"); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 462 (6th Cir.1982) ("[t]he principles governing the liability of a bankruptcy trustee are applicable to a debtor in possession"); *see generally* 5 *Collier* ¶ 1107.01–.02[1], at 1107–1 to –4 (section 1107 " 'places a debtor in possession in the shoes of a trustee in every way' ") (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 404 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6360; S.Rep. No. 989, 95th Cong., 2d Sess. 116, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5902).

██ █Woodson argues, in the alternative, that Fireman's Fund's objection was untimely, even if measured from the date Woodson made a formal claim of exemption, because it was not filed with the court until February 12, one day later than allowed by the Bankruptcy Rules. But Woodson's supplemental schedule was not merely late, it was also materially defective, at least with respect to Fireman's Fund, because it was not served on Fireman's Fund or its attorney. This clearly violates the applicable bankruptcy rule, which provides that "[t]he debtor shall give notice of [any] amendment [to the schedule of assets] to the trustee *and to any entity affected thereby.*" Bankr.R. 1009 (emphasis added). We read Rule 1009 in conjunction with Rule 1007(h) as calling for reasonable notice: It requires notification of those creditors who have a sufficient stake in the issue that they would be likely to object. Fireman's Fund, holding 90 percent of the unsecured claims against Woodson's personal estate, plainly was an entity affected by Woodson's claim to an exemption worth some $1 million.[6]

Woodson's failure to serve Fireman's Fund with its supplemental schedule is particularly significant because Fireman's Fund's objection was filed only a day late. The objection might well have been timely had Fireman's Fund received the supplemental schedule when it was supposed to. *See In re Fisher,* 63 B.R. 649, 650 (Bankr. W.D.Ky.1986) (permitting objection filed 34 days after creditors' meeting but within 30 days of receipt of notice where "[i]t was through the debtor's own oversight that this creditor was not given prior notice of the bankruptcy" and where there was no prejudice to debtor). Because Woodson's supplemental schedule was defective—at least as against Fireman's Fund—it did not immediately trigger Fireman's Fund's duty to object and its February 12 filing was timely.

Woodson contends, however, that he was not required to file a supplemental schedule at all because he made his claim to the proceeds of the life insurance policy in his original schedule when he listed the policy as exempt under Cal.Civ.Proc.Code § 704.100(a). According to Woodson, his claim to the $1 million was precisely the same; the supplemental schedule only "pedantically restated the exemption appearing in his October 9, 1984 Schedule of Exempt property." Woodson Brief at 15.

██ To state this argument is to refute it. Woodson's original schedule only claimed as exempt an unmatured life insurance policy; the California Code provision on which he relied applies only to such unmatured policies.[7] Receipt of the $1 million changed the situation dramatically. The unmatured policy, clearly exempt under Cal.Civ.Proc.Code § 704.100(a), ceased to exist. The proceeds were not covered by section 704.100(a); instead, they raised a wholly different legal issue, whether they were swept into the estate by 11 U.S.C. § 541(a)(5) because they were acquired within 180 days after filing of the petition. The two assets were different; the claims of exemption were different; the legal issues were different. Woodson's contrary argument is not merely unpersuasive, it is frivolous.

██ We also understand Woodson to be claiming that he was not required to list

---

6. When there is an independent trustee, most creditors, particularly smaller ones, are likely to rely on the trustee to smoke out any assets properly belonging to the estate. The debtor's responsibility to serve creditors is therefore narrower. But where, as here, no independent trustee is guarding the creditors' interests, and the debtor in possession has a powerful conflict of interest, the debtor should err on the side of caution in deciding which creditors to serve. The case for serving Fireman's Fund here was particularly compelling. Woodson's interest was in keeping all of the money; the company's interest was in draining as much as possible out

of Woodson's personal estate and into the company coffers. None of the parties served, however, had an interest in keeping the proceeds of the policy for Woodson's creditors. Fireman's Fund should have been served so that it could evaluate whether to advocate that position.

7. Woodson's Schedule B–4 claimed an exemption based on subsection (a) of Cal.Civ.Proc. Code § 704.100, the subsection dealing with unmatured policies. Proceeds of matured policies are the subject of subsection (c) of that same section.

the $1 million because he just did not believe it to be ,the type of after-acquired property that became part of the estate. This argument, too, is meritless. The debtor has the clear responsibility of scheduling those assets that arguably belong to the estate: "If any of the property required to be reported under this subdivision is claimed by the debtor as exempt, the debtor shall claim the exemptions in the supplemental schedule." Bankr.R. 1007(h).[8] It is then up to the creditors to decide whether to challenge the debtor's position and up to the court to resolve any such challenge. *See Hannan v. Charness (In re Hannan)*, 127 F.2d 894, 897 (7th Cir.1942). The debtor—particularly a debtor in possession who has no trustee looking over his shoulder—must be scrupulous in providing notice of all assets to which others may make a legitimate claim. While the debtor's view may ultimately prevail—we consider that question below—he may not pretermit the inquiry by failing to disclose the asset just because he himself is satisfied he may keep it.

■ Woodson also argues that Fireman's Fund's responsibility to object arose long before he filed his supplemental schedule because it had actual notice of the $1 million at least as early as October 24, the date of the creditors' meeting. But, as of that date, the $1 million asset was not listed in any of Woodson's schedules; his claim to it, and the legal basis therefor, was nowhere to be found in the record. A creditor is not required to object to an exemption in anticipation of an actual claim by the debtor. Scheduling of the asset and filing of a claim of exemption establish on the record the existence of the asset and the nature and basis of the debtor's claim to it. Even if Fireman's Fund knew about the $1 million as of October 24, it was entitled to rely on the debtor to discharge his duty under Bankruptcy Rule 1007(h) by

supplementing the schedule and making a formal claim of exemption. We refuse to hold that, by violating his duty to supplement the schedule in a timely fashion, Woodson foreclosed the creditor's objection.

■ Finally, Woodson makes the sophistic argument that his supplemental schedule was not an "amendment" under Rule 4003(b), and therefore did not give creditors another 30 days to object. Woodson bases this argument on the distinction in Fed.R. Civ.P. 15 between an "amendment" and a "supplement." *See* Bankr.R. 7015 ("Rule 15 F.R.Civ.P. applies in adversary proceedings"). An amendment, according to Woodson, "correct[s] or augment[s] facts or contentions existing or purportedly known to a party at the time his original pleading was filed." Woodson Brief at 16. On the other hand, Woodson argues, a supplemental pleading sets forth "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d).

Woodson's argument fails on any of several grounds. It is, first of all, beside the point under the circumstances of this case. Woodson knew about the $1 million on October 9 when the original Schedule B–4 was filed and he was therefore required to list the asset then. Because the January 10 supplemental schedule "correct[ed] or augment[ed] facts or contentions existing *... at the time his original pleading was filed*," it was an "amendment" even under Woodson's crabbed construction of the rules. Moreover, Federal Rule 15 is incorporated into the bankruptcy rules only in adversary proceedings and applies only to "pleadings." Bankr.R. 7015; Fed.R.Civ.P. 15. This was not an "adversary proceeding" as defined in Bankruptcy Rule 7001, nor are the schedules "pleadings."

In any event, importing Rule 15's distinction between amendments and supplements

---

**8.** "Under the Bankruptcy Act all property of the debtor becomes part of the estate available to satisfy the creditors' claims. 11 U.S.C. § 541(a). The debtor then may remove some of the property by claiming exemptions under 11 U.S.C. § 522(b)." *Payne*, 775 F.2d at 204; *see In re McAlister*, 56 B.R. 164, 166 (Bankr.D.Or.1985)

("even exempt property must initially be regarded as property of the estate and then claimed and distributed as exempt"); 4 *Collier* ¶ 541.01, at 541–6, ¶ 541.02[3], at 541–15 to –16; *see also* 3 *Collier* ¶ 521.06[3], at 521–24 ("[p]roperty that is to be claimed as exempt should nevertheless be included in the property schedules").

in this context would seriously undermine Bankruptcy Rule 1007(h). That rule requires a debtor to schedule certain property that is acquired after filing but that nonetheless may belong to the estate under 11 U.S.C. § 541(a)(5). This is no idle gesture. It is plainly intended to notify creditors of the asset, as well as of any claims of exemption, so that they can object. If, as Woodson contends, the new filing does not give creditors the right to object, they would never be able to object to claims of exemption made more than 30 days after the creditors' meeting. This runs squarely contrary to the clear policy of the bankruptcy rules that creditors be given a fair opportunity to object to claims of exemption within 30 days after they are first made of record.

We therefore conclude that Fireman's Fund's objection to Woodson's claim of exemption was timely and the bankruptcy court erred in failing to consider it in approving the compromise agreement.

## 2. The Merits

We turn now to the substantive questions presented: whether Woodson was entitled to an exemption of the full $1 million and whether the bankruptcy court erred in approving the compromise.

9. Section 541(a)(5) was amended in 1984, effective in cases filed after October 10, 1984, to begin, *"Any* interest in property...." 11 U.S.C. § 541(a)(5) (Supp. IV 1986) (emphasis added).

10. Under California law, which Woodson elected to apply under 11 U.S.C. § 522(b)(2)(A) (1982), the proceeds would then be exempt, if at all, only to the extent necessary to support him and his children. Cal.Civ.Proc.Code § 704.100(c).

11. 11 U.S.C. § 522 provides in pertinent part:
    (b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate ...
    (1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize....

    .   .   .   .   .

    (d) The following property may be exempted under subsection (b)(1) of this section:

    .   .   .   .   .

### a. *The Claim of Exemption*

Under section 541 of the Bankruptcy Code, the debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1982). In addition, the Code sweeps into the estate "[a]n interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date ... as a beneficiary of a life insurance policy or of a death benefit plan." 11 U.S.C. § 541(a)(5)(C).[9] This language precisely describes the $1 million Woodson acquired on September 8, 1984.[10]

Woodson argues, however, that section 541(a)(5)(C) does not apply where the debtor owned the unmatured policy on the date he filed the chapter 11 petition. He relies heavily on the decision of the Fourth Circuit in *BancOhio Nat'l Bank v. Walters,* 724 F.2d 1081 (4th Cir.1984), which held that the proceeds of an exempt policy owned by the debtor on the petition date were completely exempt after maturity under 11 U.S.C. § 522(d)(7) (1982), the federal analog to Cal.Civ.Proc.Code § 704.100(a).[11] The *BancOhio* court reasoned that "[t]he proceeds derived from such policies 'owned by the debtor and claimed by him as ex-

(7) Any unmatured life insurance contract owned by the debtor, other than a credit life insurance contract.
(8) The debtor's aggregate interest, not to exceed in value $4,000 less any amount of property of the estate transferred in the manner specified in section 542(d) of this title, in any accrued dividend or interest under, or loan value of, any unmatured life insurance contract owned by the debtor under which the insured is the debtor or an individual of whom the debtor is a dependent.
As of January 1, 1985, section 522(d) exemptions are no longer authorized in California. Cal.Civ.Proc.Code § 703.130 (West 1987). Debtors may in most cases, however, elect exemptions under Cal.Civ.Proc.Code § 703.140(b)(7)–(8) (West 1987), which provides exemptions identical to those under 11 U.S.C. § 522(d)(7)–(8).

empt ... flow as an incident of ownership of the contract to the debtor rather than to the estate.'" *Id.* at 1083 (quoting *In re Walters,* 14 B.R. 92, 94 (Bankr.S.D.W.Va. 1981)). Woodson contends that, under the reasoning of *BancOhio,* his "contingent interest" in the insurance policy was "vested" on the date of the petition, and the proceeds constitute merely an increase in value of a totally exempt asset. The district court properly rejected this reasoning. *Accord In re Poynor,* 68 B.R. 919, 923 (Bankr.N.D.Tex.1987) (rejecting *BancOhio* and following the opinion of the district court in this case).

The analysis advanced by Woodson and the Fourth Circuit overlooks the distinction between owning a policy and being its beneficiary. Section 522 only protects the debtor's ownership interest in the policy, that is, the right to maintain the policy and name a beneficiary. *See* H.R.Rep. No. 595, at 361, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6317 (section 522(d)(7) "refers to the life insurance contract itself. It does not encompass any other rights under the contract, such as the right to borrow out the loan value"); 3 *Collier* ¶ 522.16, at 522–63 (same). Section 541, on the other hand, deals only with proceeds the debtor receives as a beneficiary, a status not necessarily coextensive with that of ownership. One can own a policy yet not be its beneficiary and, conversely, one can be the beneficiary of a policy one does not own. Section 522 deals with one interest, section 541 with the other. That the debtor in this case happened to wear both hats is of no consequence. We must treat the two interests disparately because the Bankruptcy Code does so.[12] *See In re Poynor,* 68 B.R. at 923 ("[t]his distinction between

ownership rights and beneficiary rights appears to be more consistent with the intent of the Bankruptcy Code").

The Fourth Circuit reached the opposite conclusion in part because it perceived a conflict between section 541 (which brings the *proceeds* of a policy into the estate to the extent the policy matures within 180 days of filing) and section 522 or its state equivalent (which provides that *policies* shall not be included within the estate to the extent they are unmatured on the date of filing). 724 F.2d at 1082–83. Because section 541(a)(5) brings into the estate property that was not included at the time of filing, it may frequently seem somewhat at odds with section 522. But there is, in fact, no conflict between them because they deal with different points in time: Section 522 exempts the policy as of the date of filing, whereas section 541(a)(5) sweeps in proceeds acquired later.

Moreover, the two provisions deal with assets that are quite clearly different. Section 522 exempts life insurance policies that (but for their loan or cash surrender value) are valuable only to the debtor. The right to maintain a policy may be a very important one, particularly if the principal's insurability has deteriorated since the policy was purchased. *See* Vukowich, *Debtors' Exemption Rights Under the Bankruptcy Reform Act,* 58 N.C.L.Rev. 769, 786 (1980) (section 522(d)(7) protects debtor against having to find new insurance at higher rate or at a time when he may be uninsurable). But this right to maintain the policy is of value to the debtor only; it is not capable of sale or transfer and is therefore of little use to the estate.[13] Policy proceeds, on the

---

12. Both federal and California law fully exempt the ownership interest in the unmatured life insurance policy and exempt the loan value of the policy up to $4000. *See* 11 U.S.C. § 522(d)(7)–(8); Cal.Civ.Proc.Code §§ 703.-140(b)(7)–(8), 704.100(a)–(b). Both only partially exempt the proceeds of matured life insurance policies based on the needs of the debtor. *See* 11 U.S.C. § 522(d)(11)(C) (1982) (proceeds of life insurance contract insuring life of individual of whom debtor was a dependent at insured's death are exempt "to the extent reasonably necessary for the support of the debtor

and any dependents of the debtor"); Cal.Civ. Proc.Code § 704.100(c).

13. "Under [Cal.Civ.Proc.Code § 704.100(a)], the judgment creditor is precluded from reaching an unmatured policy except for its loan value; this prevents the judgment creditor from forcing the judgment debtor to surrender a life insurance policy for its cash value." Legislative Committee Comment—Assembly (1982), *reprinted after* Cal.Civ.Proc.Code § 704.100, at 329 (West 1987). Nonetheless, any loan value of the policy, which is ascertainable, is only partially exempt. *See* note 12 *supra.* Woodson thus

other hand, are fully liquidated and therefore readily usable by the estate to pay creditors. It seems perfectly logical for the bankruptcy laws to protect an unmatured policy while subjecting the proceeds of a matured policy to the reach of creditors.[14] The two assets are treated differently because they in fact *are* different.[15] As Judge Williams accurately summarized,

[t]he interest of the debtor as beneficiary of the policy is distinct from his ownership interest: each interest has certain rights and privileges. It is entirely within the contemplation of the statutory language that differing interests in the same property will accrue to an individual at different points in time. The statutory language does not appear to set the status of a debtor's interest in stone: rather, the statute is written in flexible language, to accommodate the possibility of changes in the status of a debtor's interest in property.

*In re Woodson,* No. CV–85–3960–SW, mem. at 3 (N.D.Cal. Nov. 1, 1985); *accord In re Poynor,* 68 B.R. at 923.

It is the Fourth Circuit's approach that would, in our view, create serious anomalies and undermine an important policy of the Bankruptcy Code. Section 541(a)(5) represents Congress's most recent effort at preventing debtors from manipulating the bankruptcy date so as to deprive creditors of certain assets, including those acquired as a beneficiary of a life insurance policy. Section 70(a) of the Bankruptcy Act of 1898, the predecessor to section 541(a)(5), was amended in 1938 to give the trustee

"[a]ll property which vests in the bankrupt within six months after bankruptcy by bequest, devise, or inheritance...." 11 U.S. C. § 110(a) (1976). Under prior law, "the bankrupt [had been able] to divest himself of his debts through bankruptcy and yet possibly come into great wealth during the administration of his estate by virtue of the ripening of contingent or executory interests untouched by bankruptcy." 4A *Collier on Bankruptcy* ¶ 70.03[2], at 37 (14th ed. 1978); *see also* National Bankruptcy Conference, *Analysis of H.R. 12889,* 74th Cong., 2d Sess. 226 (Comm.Print 1936). Debtors were thus able to obtain credit from lenders or merchants and then invoke the bankruptcy laws for the purpose of retaining the after-acquired assets free and clear of all debts, an abuse condemned by Congress as "virtually a fraud upon the act." H.R.Rep. No. 1409, 75th Cong., 1st Sess. 34 (1937), *quoted in* 4A *Collier on Bankruptcy* ¶ 70.03[2], at 37 (14th ed. 1978); *Analysis of H.R. 12889,* at 226.

By its 1938 amendment to section 70(a), Congress rejected blind adherence to the principle that the bankruptcy date is a point of "cleavage" and that all after-acquired property is exempt from the estate, because "[i]n many cases the operation of this rule resulted in a great boon to the bankrupt, whose creditors were meanwhile compelled to content themselves with the bare bones of his impoverished estate." 4A *Collier on Bankruptcy* ¶ 70.37, at 460 (14th ed. 1978).[16] Section 541(a)(5) carried this policy forward into the current Bankruptcy Code, adding life insurance proceeds

---

claimed, on behalf of himself and Mrs. Woodson, $8000 of the $28,000 loan value as exempt under section 704.100(b).

**14.** *See In re Poynor,* 68 B.R. at 922–23 ("[t]o allow the debtor/beneficiary to exempt life insurance proceeds greater than the extent 'reasonably necessary for support' would provide the debtor with a windfall.... [T]he intent of the Bankruptcy Code appears to require such excess to be available to the creditors"); Vukowich, 58 N.C.L.Rev. at 787 ("[t]he new Act's life insurance exemption is reasonable. It preserves debtors' life insurance policies while not allowing them to be harbors of wealth at the expense of creditors").

**15.** While the contractual rights of ownership are vested, where, as here, the owner may change

the beneficiary, the beneficiary's right in the unmatured policy is not vested "but [is] only a revocable expectancy contingent upon being the beneficiary at the time of the insured's death." 4 G. Couch, *Cyclopedia of Insurance Law* § 27:59, at 682–83 (rev. 2d ed. 1984) (citing California and Ninth Circuit cases).

**16.** The National Bankruptcy Conference noted that "'[t]o an extent this involves a departure from the strict theory of the date of cleavage, but the bankrupt ought not to get the benefit of all legal complications at the expense of creditors.'" *Analysis of H.R. 12889,* at 226 (quoting McLaughlin, *Amendment of the Bankruptcy Act,* 40 Harv.L.Rev. 583, 609–10 (1927)).

to the list of after-acquired assets to which this rule applies.

■ Woodson's case illustrates perfectly the problem Congress sought to address by passing section 541(c)(5) and its predecessor. Mrs. Woodson died of brain cancer; her death could not have come as a surprise to Woodson. His personal bankruptcy petition preceded her death by three days; the related chapter 11 proceeding for his company was not filed for another week. This sequence of events raises an inference that Woodson moved forward the date of his personal bankruptcy petition in an attempt to keep the $1 million out of the estate and away from his creditors. Section 541(a)(5) makes it unnecessary for the court to resolve such difficult questions about the debtor's intent. It provides a prophylactic rule that operates without regard to the debtor's subjective state of mind. The provision removes the debtor's incentive to manipulate by making the bankruptcy date largely irrelevant to whether those assets will be included in the estate.

The Fourth Circuit's approach seriously undermines section 541(a)(5) by excluding from its sweep life insurance policies where the debtor is both owner and beneficiary. It makes no sense whatsoever to include within the estate proceeds of policies where the debtor is beneficiary but not owner, while excluding the proceeds where he is both. It is the latter situation that poses the greatest risk of manipulation of the kind that Congress sought to prevent through section 541(a)(5). The result reached in *BancOhio* simply cannot be reconciled with the Code's language or purpose.

b. *The Compromise*

■ ■ The bankruptcy court has great latitude in approving compromise agreements. *See Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380–81 (9th Cir.), *cert. denied sub nom. Martin v. Robinson*, — U.S. —, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). However, the court's discretion is not unlimited. The court may approve a compromise only if it is "fair and eq-

uitable." *Id.* at 1381; *see* 11 U.S.C. § 1129(b)(1) (1982) (reorganization plans must be "fair and equitable" as to nonconsenting class); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) (applying standard of section 1129's precursor to compromises). Moreover, in passing on the proposed compromise, the court must consider:

"(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

*A & C Properties*, 784 F.2d at 1381 (citation omitted); *see Anderson*, 390 U.S. at 424, 88 S.Ct. at 1163.

■ We are unable to approve the bankruptcy court's order authorizing the compromise because the bankruptcy court failed to follow *A & C Properties* and *Anderson*. The agreement it approved was not a compromise but a complete rejection of Fireman's Fund's claim. The so-called compromise allocated $100,000 of the $1 million to the company's creditors and the remaining $900,000 to Woodson himself. Woodson's personal creditors were given nothing. Even if the bankruptcy court believed that Fireman's Fund's objection was unmeritorious or untimely, it should have recognized that Fireman's Fund had *some* probability of ultimate success on its claim, and therefore that Woodson's personal creditors had *some* entitlement to the $1 million. Moreover, Woodson was debtor in possession, and the bankruptcy court had a special responsibility to guard against a compromise that so clearly served Woodson's own interests at the expense of his creditors. No responsible trustee would have proposed as "fair and equitable" a compromise that gave $900,-000 to the debtor and not a cent to his creditors. *See A & C Properties*, 784 F.2d

at 1381 (trustee has burden of persuading court that settlement is fair and equitable).

Because the bankruptcy court did not engage in the analysis called for by *A & C Properties* and *Anderson,* we must infer that it failed to allocate any portion of the $1 million to Woodson's personal creditors based on its own determination as to the merits of Fireman's Fund's objection, not on an assessment of the ultimate likelihood that the objection would be upheld. Indeed, on remand from the district court, the bankruptcy court gave Fireman's Fund's claim no consideration at all under the mistaken impression that the objection was untimely. Broad as the bankruptcy court's power may be, it may not completely ignore a nonfrivolous objection, at least without giving a reasoned explanation for doing so. *See A & C Properties,* 784 F.2d at 1383–84 (upholding compromise where bankruptcy court fully considered and ruled on all substantial objections). We must therefore affirm Judge Williams' decision reversing the bankruptcy court's order approving the compromise.

On remand, the bankruptcy court shall allocate to Woodson only that portion, if any, of the $1 million permitted him under Cal.Civ.Proc.Code § 704.100(c). The bankruptcy court shall make an independent determination on this issue and, if appropriate, Woodson shall be ordered to return all or part of the $400,000 previously released to him.

### CONCLUSION

We hold that Fireman's Fund's objection to Woodson's claim of exemption was both timely and meritorious. We therefore affirm in No. 86–1524; in No. 86–2775 we reverse and remand for further proceedings consistent with this opinion. Fireman's Fund may recover its costs on both appeals.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.