19 F.3d 26
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re DALEY'S DUMP TRUCK SERVICES, INC., Debtor.
SCI CONTRACTORS, INC., Appellant,
v.
DALEY'S DUMP TRUCK SERVICES, INC., Appellee.
 No. 92-36877.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 8, 1994.
Decided March 22, 1994.
 
 Before: HUG, HALL, and THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 SCI Contractors, Inc. appeals the district court's affirmance of a bankruptcy court order rejecting the proposed settlement of a pass-through claim by chapter 11 debtor Daley's Dump Truck Services, Inc. against the Municipality of Metropolitan Seattle. We conclude that the bankruptcy court failed to provide a rational explanation for rejecting the settlement agreement and, accordingly, we reverse and remand.
 
 I.
 
 3
 The Municipality of Metropolitan Seattle ("Metro") hired SCI Contractors, Inc. as general contractor for the Pine Street Tunnel/Westlake Station portion of the Downtown Seattle Transit Project. SCI subsequently subcontracted with Daley's Dump Truck Services, Inc. for excavation work on the project. In the course of performing the subcontract, Daley's suffered significant cost overruns, lost several million dollars, and became insolvent.
 
 
 4
 As a result, Daley's filed a chapter 11 bankruptcy petition and, ultimately, confirmed a plan of reorganization providing for full payment of all priority claims (approximately $450,000) and five percent payment of general unsecured claims (approximately $50,000). [ER 24-45]. Under the plan, Daley's had three sources of assets with which to make distributions: (1) tangible assets of approximately $300,000; (2) a $150,000 deed of trust against the personal residence of Daley's sole shareholder, Bert Daley, made as a guarantee of Daley's obligations under the plan; and (3) an unliquidated $2.3 million claim against SCI and Metro for losses from the construction project. [Id.]
 
 
 5
 After confirmation, Daley's sought to collect the unliquidated claim. As part of this process, Daley's and SCI negotiated and obtained bankruptcy court approval of an agreement ("SCI/Daley's Agreement") [ER 15] releasing claims against each other and establishing a procedure for jointly asserting a "pass-through" claim against Metro.[1] The agreement, which provided for SCI and Daley's to share equally any net recovery from Metro, gave SCI authority to settle the pass-through claim but required bankruptcy court approval of any settlement for less than $1 million.
 
 
 6
 Pursuant to the SCI/Daley's Agreement, SCI initiated negotiations with Metro by filing a statement of claim. Metro first denied all liability but later offered to settle for $200,000 and then $500,000. SCI rejected both proposals. Metro then made a final settlement offer of $700,000, vowing to go to trial if SCI did not accept. [Tr. 42-48]. After estimating that it would cost up to $350,000 to litigate, that Daley's maximum potential recovery pursuant to the SCI/Daley's Agreement was $750,000, and that there was little chance of recovering more than $1 million in total on the claim, SCI accepted Metro's offer ("Metro/Daley's Agreement"). [Tr. 48-55].
 
 
 7
 Daley's share of the $700,000, after deducting legal expenses, lien claims, and SCI's share, was approximately $125,000. [ER 14]. Unsatisfied with this recovery, Daley's objected to the settlement.[2] SCI nevertheless filed a petition for approval in the bankruptcy court. The court rejected the settlement, holding that "it makes no economic sense for [Daley's] to accept the settlement" because it would not guarantee that the estate could satisfy the $450,000 worth of priority claims. [ER 11]. SCI appealed and the district court affirmed, concluding that the bankruptcy court had "adequately considered" the reasonableness of the agreement. [ER 4].
 
 II.
 
 8
 We review the bankruptcy court's disapproval of a settlement agreement for abuse of discretion. E.g., Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1380 (9th Cir.), cert. denied, 479 U.S. 854 (1986). "The bankruptcy court has great latitude in approving [or disapproving] compromise agreements. However, the court's discretion is not unlimited. The court may approve a compromise only if it is fair and equitable." Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir.1988) (internal citation and quotation omitted). Specifically, the court must consider four factors in determining the adequacy of a proposed settlement:
 
 
 9
 (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views....
 
 
 10
 Id. (internal quotation omitted). See Protective Comm. v. Anderson, 390 U.S. 414, 424 (1968).
 
 
 11
 The bankruptcy court below recognized these four factors but engaged in little substantive analysis of the first three. Regarding the probability of success on the merits, the court found that "it is impossible ... to predict the success or outcome of any litigation that might take place as between Daley's and SCI and Metro." [ER 9]. Regarding the difficulties of a suit against Metro, the court believed that "any such litgation will be complex, lengthy, time consuming, and expensive." [Id.] And, regarding the ability to collect a judgment, the court held that "insofar as we know, both Metro and SCI are solvent and responsible; and collection here is really a non-factor." [Id.]
 
 
 12
 The court, therefore, implicitly found two factors to weigh in favor of accepting the settlement and a third factor to be neutral. Nevertheless, the court believed the fourth prong of analysis to be determinative:
 
 
 13
 The fourth item is the interest of creditors. And this, I think, is the key to the entire matter....
 
 
 14
 As I see it, when you get down to the bottom line of all this, the proposed settlement will net the debtor approximately $125,000, give or take a few dollars one way or the other. That sum, according to [Daley's attorney], will not even cover the priority claims against the estate.
 
 
 15
 Further, according to [the attorney]--and I have no reason to believe that his statements are inaccurate--if you take the $125,000 and then liquidate all of the debtor's assets and then liquidate all of Mr. Daley's assets and you add the total of all the liquidations together, you still might not have enough money to cover the priority claims against the estate. In other words, it makes no economic sense whatsoever for this Chapter 11 debtor to accept the settlement.
 
 
 16
 And inasmuch as it would not satisfy priority claims, I conclude it can hardly be deemed to be in the best interests of the creditor constituency as a whole.
 
 
 17
 Frankly, with this sort of a net recovery, the debtor, the bankrupt estate, and its creditors have nothing to lose--virtually nothing to lose--by litigating with Metro and SCI. They can't do much worse than this proposed settlement.
 
 
 18
 [ER 10-11].
 
 
 19
 The bankruptcy court's analysis is flawed because it appears to rest on the faulty premise that the settlement was inadequate as a matter of law by not covering priority claims. Such a premise ignores the fundamental requirement that courts "compare the terms of the compromise with the likely rewards of litigation." Anderson, 390 U.S. at 425. SCI illustrates the bankruptcy court's apparent error with a cogent example:
 
 
 20
 Under the Bankruptcy Court's analysis, assuming an estate with claims of $100,000 and other assets of $50,000, a settlement of $51,000 on a $1 million claim would necessarily be reasonable because claims would be covered by available assets. Conversely, a settlement of $49,000 on a $100,000 claim could never be approved because there would be the potential that a greater recovery might be obtained through litigation. The Bankruptcy Court looked only at the absolute dollar amount and concluded that the estate could use more money. The problem is that the Bankruptcy Court did not consider whether the settlement was reasonable in terms of Daley's entitlement to more money from Metro.
 
 
 21
 [Gray Brief at 10 (emphasis added) ].
 
 
 22
 Although the bankruptcy court may not have engaged in such impermissible reasoning, we cannot be sure from the record. In fact, that is precisely the problem: "It is essential ... that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law." Anderson, 390 U.S. at 434.
 
 
 23
 "If, indeed, the record contained adequate facts to support the decision of the trial court to [dis]approve the proposed compromise, [we] would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based. The deficiency in this case, however, is not merely a formal one." Id. at 437. Specifically, SCI showed that in order to achieve any greater net recovery, Daley's would have to obtain a judgment of more than $1.1 million against Metro at trial ($1.1 million less $350,000 litigation expenses less $445,000 lien claims less SCI's 50% share of the remaining $250,000 equals $125,000). [Tr. 50]. SCI also presented evidence regarding the strength of Metro's defenses against the pass-through claim and the reasons why recovery of more than $1 million on the claim was unlikely. [Tr. 36-42; Exs. 10, 12]. At the least, we think the bankruptcy court should have stated more fully why it believed the settlement to be unreasonable.
 
 
 24
 Also, the bankruptcy court appears to have miscalculated the return to creditors under Daley's plan of reorganization. According to the Second Amended Disclosure Statement, Daley's total assets with the $125,000 from the Metro settlement would have been $571,400 ($296,400 in tangible assets plus $150,000 from the deed of trust on Bert Daley's residence plus $125,000 from the Metro settlement).[3] [ER 24-45]. This amount would have been sufficient to cover all distributions under the plan, making clearly erroneous the court's conclusion that the settlement was not sufficient to satisfy the priority claims. Although Daley's attorney apparently stated that real estate values had declined to the point where Daley's assets would not have exceeded $500,000 even with the $125,000 settlement, [ER 11], we cannot verify this statement in the record. The only evidence before us is the Second Amended Disclosure Statement, which indicates to the contrary.
 
 
 25
 Finally, the bankruptcy court, which held that "SCI is certainly not a disinterested creditor and hardly has any other creditors or their claims in mind here," [ER 10], apparently was concerned that SCI had negotiated the Metro/Daley's Agreement without considering the interests of the bankruptcy estate. Initially, we note that SCI settled its claims by entering into the SCI/Daley's Agreement and therefore was no longer a creditor of Daley's estate. More importantly, by providing for an equal split of any net recovery from Metro, the SCI/Daley's Agreement actually aligned the parties' interests. On paper, SCI had the same interest as Daley's in obtaining as great a settlement from Metro as possible. As a result, SCI actually would have protected Daley's creditors by negotiating the best deal for itself.
 
 
 26
 Daley's claims that, because SCI had exceeded an agreed-upon reserve fund with Metro,[4] SCI in fact benefitted by settling for a lower amount. SCI disputes that contention, asserting that Metro had not allocated any claims toward the reserve fund when it negotiated the Metro/Daley's Agreement. Unfortunately, the bankruptcy court never made any findings on this issue. [Tr. 60]. A conflict of interest could, of course, weigh heavily on an assessment of the reasonableness of the settlement. On remand, the court should ascertain whether SCI actually had an interest in depressing the value of the settlement to avoid liability on that part of Daley's claim, if any, that exceeded the reserve fund.
 
 III.
 
 27
 We conclude that the bankruptcy court abused its discretion by rejecting SCI's proposed settlement without rationally explaining its reasons for doing so. We remand so that the court may reconsider its rejection of the settlement. In doing so, the court should consider with particularity the probability of success at trial and the degree to which the current settlement would fulfill Daley's requirements under the confirmed plan of reorganization. The court should also determine whether SCI settled for an artificially low sum in order to reduce its own liability for claims exceeding the reserve fund it had previously established with Metro. Only by engaging in this analysis will the court be able to make an informed decision on the merits of the settlement.[5]
 
 
 28
 REVERSED and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Under Washington law, subcontractors may sue only the general contractor, and not the government owner, for losses suffered in the course of performing public-works contracts. The general contractor may, however, avoid being sued by asserting a "pass-through" claim on behalf of the subcontractor to recover losses caused by the government. See Wash.Rev.Code Secs. 39.04.010, 39.08.010, 60.28.010; [Tr. 26-27]
 In this case, Daley's claimed that Metro caused its losses by changing and delaying the project. As a result, the SCI/Daley's Agreement provided for SCI to assert a pass-through claim on behalf of Daley's.
 
 
 [2]
 Daley's also filed suit against SCI for breaching the SCI/Daley's Agreement by excluding it from settlement negotiations. See Daley's Dump Truck Servs., Inc. v. SCI Constr. Co. (In re Daley's Dump Truck Servs., Inc.), No. C92-911R (W.D.Wash.). That suit, which is stayed pending this appeal, is the proper place for Daley's to raise the breach of contract allegations it implicitly makes against SCI in this case
 
 
 [3]
 Although we sympathize with Bert Daley's attempt to avoid selling his house, we note that he did agree to secure the deed of trust in order to formulate an acceptable plan of reorganization. As a result, the residence became part of the pool of assets available for distributions under the plan
 
 
 [4]
 In negotiating a settlement of all claims regarding the Pine Street Tunnel/Westlake Station project, SCI and Metro had agreed to reserve $3.26 million for total potential liability on the Daley's claim and the claim asserted by Elcon, another SCI subcontractor. Prior to negotiating the Metro/Daley's Agreement, SCI had settled with Elcon for $4.995 million. Because this settlement involved the Pine Street Tunnel/Westlake Station project (contract CU-04) and the Pioneer Square project (contract CU-03B), it may or may not have exhausted the reserve fund, depending on allocation of the settlement amounts
 
 
 [5]
 Because SCI's appeal is not frivolous, we decline Daley's request for attorney's fees and double costs. Fed.R.App.P. 38